ESRA S. GOSNEY, As Trustee, Appellant, v. RALPH E. COSTIGAN ET AL.—33 S. W. (2d) 947.

Division Two, December 31, 1930.

*Dryer, Castle & Richards* and *Mosman, Rogers & Buzard* for appellant.

*Culver, Phillip & Voorhees* for respondents.

BLAIR, P. J.—This is an equitable action by one trustee to require his co-trustee to restore to the trust estate certain bonds alleged to have been improperly appropriated from such estate, or for judgment in favor of the estate in lieu thereof. A third trustee was made a party defendant. Trustees of two closely related organizations were afterward brought in as defendants. The trial court found for defendants and denied all prayers for removal of trustees. From such decree plaintiff has appealed.

The pleadings should first be noticed briefly. The following facts appear from the allegations of the petition. Sarepta W. Noyes, to whom we will usually refer as testatrix, died in Los Angeles, California, December 13, 1923. Her will was filed in the Probate Court of Buchanan County, January 4, 1924, and was duly probated January 14, 1924. By the fifth clause of her will she gave the residue of her estate to the plaintiff, the defendant Costigan and John D. Richardson, as trustees for the benefit of Noyes Hospital of St. Joseph and the Home for Little Wanderers of St. Joseph. For convenience, we will usually refer to the parties by their surnames. Costigan and Richardson were named as executors of said will. Richardson died very soon after the death of testatrix and before her will was probated, and Costigan was afterwards appointed as sole executor. Under the provisions of the will Gosney and Costigan afterward agreed upon and appointed Burnes National Bank of St. Joseph as trustee to succeed Richardson. The petition named Costigan and said bank as defendants, and alleged that testatrix owned five Fourth 4¼% United States Liberty bonds, of the par value of $10,000 each, at the time of her death, and that Costigan took possession of said bonds after her death, refused to account therefor to the estate and appropriated the same to his own use.

The answer of Costigan admitted that he was executor of the estate of testatrix and one of the trustees under her will, and that provisions five and seven of the will, which created the trust and provided for the provisional appointing of executors, were correctly set forth in the petition; that testatrix died December 13, 1923, and denied all other allegations of the petition.

In its separate answer Burnes National Bank admitted that it was one of the trustees under the will, of which Costigan and Gosney were co-trustees. It alleged that it had made full investigation of Gosney's claim that Costigan had appropriated $50,000 in bonds belonging to the estate, that it had taken advice of counsel and had reached the conclusion that Costigan was the rightful owner of said bonds. Nevertheless, it prayed the court to require strict proof as to the ownership of said bonds, and asked it to enter such judgment as the law and the evidence warranted.

Upon motion of the bank, it and E. D. Plummer, as trustees of Noyes Hospital, and Marmaduke B. Morton and Charles B. Farish, as trustees of the Home for Little Wanderers, were made parties defendant. Said motion alleged that Charles W. Noyes, deceased husband of testatrix, had by his will created a trust fund of approximately $500,000 for the benefit of said hospital and said home; and further alleged that testatrix left approximately $500,000 in trust, the income from which was to be used by her trustees for the maintenance of said hospital and home, and that the trustees of those institutions for that reason were interested in the funds of testatrix and were necessary and proper parties to this action.

After said motion was sustained, the trustees of the hospital and the home filed separate answers. It is unnecessary to set out more than the substance of such answers. Both alleged the investigation made by the respective trustees concerning the claim of Gosney that Costigan had misappropriated $50,000 in bonds belonging to the estate, and that they had reached the conclusion that the estate was not the owner thereof at the death of testatrix. Both answers alleged the confidence of the trustees in the ability and integrity of Costigan and prayed that he be retained as trustee and asked the removal of Gosney as trustee under the will of testatrix.

The replies of Gosney to the several answers need not be noticed further than to say that they denied the allegations of such answers and particularly allegations concerning the qualifications of all of the other trustees and the allegations concerning the unfitness of Gosney to serve as trustee and prayed the removal of all the other trustees.

In his lifetime Charles W. Noyes was a resident of St. Joseph and was engaged in the manufacture and jobbing of shoes and probably in other business activities. He was successful in business and acquired a substantial fortune. He retired from active business several years before his death in 1912, leaving testatrix as his widow. During the later years of Mr. Noyes' life, he and testatrix spent most of their time in California, retaining large business interests in St. Joseph. Both maintained their legal residence in Missouri. As appears from the evidence and as alleged in the petition, Mr. Noyes

made provision in his will for a trust for the erection and maintenance of the Noyes Hospital and for the maintenance of the Home of the Little Wanderers of St. Joseph. To testatrix Mr. Noyes gave his holdings in Richardson Dry Goods Company and Noyes-Norman Shoe Company, both of St. Joseph. She evidently was heartily in accord with her husband's disposition of his estate and made similar disposition of her own fortune.

All but one of the Noyes children died in infancy. Gosney had married the only surviving daughter. She lived only a year or so after her marriage and died without leaving issue. Hence, there were no surviving children or grandchildren when testatrix died. Gosney remarried about seven years after his first wife died. A third marriage occurred about the time of or soon after the death of testatrix.

Gosney retained the confidence and esteem of testatrix and her husband in a large degree throughout all these years. He had lived in Pasadena, California, for many years, but frequently visited Mr. and Mrs. Noyes and was often consulted by them concerning their business affairs. He appears to have been a man of extensive business affairs. He testified concerning his connection with many important business enterprises, as well as his interest in civic and charitable organizations. He testified that his own fortune was at least equal to the combined fortunes of testatrix and her husband and that he had no personal interest in either estate. He had been a practicing lawyer for a number of years and formerly lived in St. Joseph. There is not a word in this record indicating that Gosney was other than a conscientious and high-minded man of splendid character and attainments and sincerely devoted to what he considered the best interests of the trusts established out of the estates of testatrix and her husband and to his duty as trustee under the will of testatrix.

The record does not disclose Costigan's financial worth, but that he was a man of large affairs and important responsibilities does appear. He was a nephew of Mr. Norman, the former partner of Charles W. Noyes, and was an employee of Mr. Noyes in his manufacturing and jobbing business for many years before his death. After the death of Mr. Norman and the retirement of Mr. Noyes and also after the death of Mr. Noyes, he was in active management and control of Noyes-Norman Shoe Company for many years. That Costigan possessed the entire confidence of Mr. Noyes is manifest from the fact that he was named as one of the trustees under his will to serve in that capacity with testatrix and John D. Richardson, the latter having been a lifelong business associate and friend of Mr. Noyes. Costigan devoted much time and work to the carrying out

of that trust during the eleven years between the deaths of Mr. Noyes and testatrix. He likewise retained the confidence of testatrix during all those years and during her subsequent widowhood to such an extent that she chose him as one of her own trustees and executors.

The visits of testatrix to St. Joseph were infrequent after her husband's death. She did not return at all during the last two or three years of her life. Her business matters were left entirely in Costigan's hands. When Mr. Noyes died, a large portion of the fortune of testatrix which she had received from him was tied up in the stock of the Richardson Dry Goods Company, the Noyes-Norman Shoe Company or in indebtedness due her from those companies. As she received funds from those companies, Costigan made other investments for her, a large part thereof being in registered United States Government bonds. He collected the interest for her and deposited the same to her account with Noyes-Norman Shoe Company. She maintained no checking account in any bank, either in California or elsewhere, and provided for her living expenses and other expenditures by the use of drafts charged against her account with Noyes-Norman Shoe Company. Costigan kept her books and accounts and advised her concerning the same from time to time. She sent her books to him once a year in order that he might check and correct them. He was intrusted with all her securities and kept them for her in St. Joseph. He advised her in other matters. He assisted her in drafting her wills and any subsequent changes in them. He sent her a rough draft of her last will, prepared and executed in California November 8, 1923, which was five weeks before her death. The age of testatrix at her death does not appear. It is conceded that she fully retained her mental faculties to the end. Her death resulted from and quickly followed a fall on the sidewalk, which caused a fracture of the femur.

That Costigan was a man of high character and possessed the entire confidence of those who knew him best needs no further proof than the answers of his co-defendants, which alleged that careful investigation had been made by them concerning the claim of Gosney that Costigan had misappropriated bonds of the estate of testatrix and that they had reached the conclusion that said bonds rightfully belonged to Costigan.

The vital issue of fact in the case is whether or not the $50,000 in bonds constituted a completed gift at the time testatrix died. Concerning her intention to give the bonds to Costigan, there can be no doubt under this record. The death of testatrix rendered Costigan an incompetent witness concerning the facts and circumstances immediately attending the alleged gift. He was not offered as a witness on any matters concerning which he might have been competent to testify.

On October 1, 1923, testatrix wrote on the stationery of "The Alexandria," the hotel where she resided in Los Angeles, the following letter:

"Dear Ralph.

"Am sending you a codicil for your approval or for your correction. It may give you an idea as to what I am wanting to have done when I have 'passed on,' except this one thing. You may remember sending me a memorandum of 'U. S. 4th Liberty Bonds Registered' and I desire that you transfer numbers 30029 to 30033, 5 bonds, $10,000—$50,000, to your account—(marked—'disposed of —a gift') if you would rather have it so, and if you wish to you may take it over now instead of waiting for me to 'pass over the divide.'. I fancy you, too, have a copy of the memo.

"Sincerely,

"SAREPTA W. NOYES."

This letter was admitted by Gosney and shown by other testimony to be in the handwriting of testatrix. An envelope marked "From Mrs. C. W. Noyes" and bearing the Coat-of-Arms and name of "The Alexandria Los Angeles" with cancelled two-cent stamp and postmarked "Los Angeles, Cal. Oct. 2, 2 P. M., 5 Arcade Sta." and addressed to Costigan in handwriting shown to be that of testatrix, was introduced in evidence. There was no direct proof that this envelope carried the above letter through the United States mail to Costigan.

An undated letter, also admitted to be in the handwriting of testatrix, was received in evidence. It read as follows:

"Dear R. E. C.

"After you have revised this codicil and advised me as to witnesses for the same, please return to me and I will attend to it immediately—Tell me if there are any corrections to make. Thanking you again and again for your patient kindness to me and trusting you will immediately *take over* the U. S. Liberty Bonds that I have written you about—(if it meets with your approval).

"Yours sincerely,

"SAREPTA W. NOYES."

As part of the same exhibit an envelope was received in evidence, addressed to Costigan and admittedly in the handwriting of testatrix. It also bore the post mark "Los Angeles, Cal. Oct. 2, 2 P. M. 1923." On the back thereof appeared a Coat-of-Arms and the printed words "The Alexandria, Los Angeles" and the written words "Sent by Mrs. C. W. Noyes" in her handwriting. There was no direct proof that there were found among the effects of testatrix in California and brought to St. Joseph by Gosney two other writings in the handwriting of testatrix. Gosney denied finding such writings among her effects. One writing was marked on the reverse side "Copy sent R. E. C." and words as follows:

"Dear R. E. C.:

"After you have revised this codicil and advised me as to witnesses for the same, please return to me and I will attend to it immediately. Tell me if there are any corrections to make.

"Thanking you again and again for your patient kindness to me and trusting you will immediately take over the U. S. Liberty bonds that I have written you about—"

The other writing appears to have been torn off the bottom of a sheet, which possibly contained other written matter as part of a letter. It reads as follows:

"Dear Ralph: After you have revised this and advised me as to witnesses for this codicil, please return to me and I will attend to it immediately.

"Thanking you again and again for all your many kindnesses and trusting that you will take over the liberty bonds I have written you about,

"Believe me

"Yours sincerely
"SAREPTA W. NOYES."

The original exhibits including both letters and purported copies and the envelopes mentioned, have been sent to this court since the case was argued and have been examined by us, under an agreement made by counsel at the time the case was argued.

We think there can be no doubt concerning the intention of testatrix during her lifetime to give the bonds in controversy to Costigan. Gosney apparently was entirely convinced of this himself, for in a letter written by him to Costigan on April 15, 1924, he said:

"Regarding the bonds there seems no doubt of her wish as to the transfer which was entirely within her oft expressed appreciation of and confidence in you. I hope you had the transfer made during her life. If not, you may have difficulty in carrying out her intention in this respect. Anything I can do to aid you in carrying out this or any other definite wish of hers, I will be glad to do."

The possibility that Costigan had not taken steps to complete the gift during the lifetime of testatrix and that the title thereto had not legally passed to Costigan for that reason, expressed in the above quotation from Gosney's letter, is no doubt the explanation of Gosney's subsequent attitude toward the alleged gift and was manifestly the reason for the institution of this suit.

No letter from Costigan to testatrix, or copy thereof, formally accepting the gift of the bonds was in evidence. Gosney testified that Costigan told him he had not written testatrix about it. Costigan was shown to have been absent from St. Joseph for about six weeks before the death of testatrix and until about the time a telegram announcing the death of testatrix was received by him in St. Joseph. Gosney came to St. Joseph about the first of January,

1924, and brought the ashes of Mrs. Noyes with him and then produced her will, which was found by him among her effects in Los Angeles.

Witnesses to make an inventory and appraisement of the estate were appointed by the probate court and their inventory included a large amount of U. S. Government bonds. The bonds described in the letter of testatrix to Costigan were not found by the appraisers in the safety deposit box where Costigan kept the securities of testatrix and were not inventoried by them as part of her estate. Nor were the bonds produced by Costigan as part of the estate. Whether said bonds remained with other securities of testatrix kept by Costigan or were taken out by him before her death was not shown by any direct evidence. Costigan's attorney, Joseph Morton, wrote Gosney that the bonds were placed with the other bonds and securities of testatrix and there remained.

When the witnesses were making the inventory and appraisement of the estate, Costigan exhibited to them the original letters of testatrix asking him to transfer the bonds to himself. The appraisers then had before them the records of testatrix showing that she had $50,000 more U. S. Government bonds than were found in the box containing her securities. After investigating the matter to their satisfaction, said appraisers did not inventory the bonds as part of the estate, but they did make and embody in their report to the executor copies of said letters.

Upon the question of Costigan's good faith in the matter, defendants were permitted to show that Costigan advised with Joseph Morton, an attorney of St. Joseph for over forty years and who appears to have been a lawyer of large experience and the trusted adviser of several of the persons connected with the Noyes affairs, including testatrix herself. Costigan presented to Morton the letters written by testatrix directing the transfer of the bonds to himself and told Morton the facts and circumstances and Morton advised Costigan that the title to the bonds was in him. Morton and Costigan then went together to the judge of the probate court and laid the facts before him. The probate judge testified at the trial that he then saw no necessity for Costigan to ask for any order of the probate court to confirm his title. These occurrences were before the will was filed for probate and before Gosney came from California with the will.

As above stated, testatrix kept records of her securities. This record was brought to St. Joseph by Gosney. There was no entry in such record indicating that $50,000 in bonds had been transferred to Costigan. It appears that testatrix made the entries on her records when and as advised to do so by Costigan. The amount in value of the United States bonds shown by the records

of testatrix was exactly $50,000 in excess of the inventory of that character of bonds made by the appraisers.

Subsequent to his appointment as executor, Costigan indorsed his name upon the five $10,000 bonds as executor of the estate of testatrix and they were forwarded by Burnes National Bank to the United States Treasury Department and exchanged for coupon bonds in the same amount and bearing the same rate of interest. Later on, Costigan sent $190,000 of registered U. S. bonds, admitted to be the property of the estate, and exchanged them in the same way. He receipted the bank in his individual name for the $50,000 in bonds, but receipted for the $190,000 in bonds in his capacity as executor. The exchange of and receipt for said bonds were some time after Gosney had raised the question of Costigan's title to the bonds.

Some claim was made by Gosney that Costigan credited the interest on the $50,000 in bonds paid in April, 1924, to the account of the estate. But that was shown not to be the fact. The record of the transaction showed a credit to Costigan personally in the exact amount of the interest the day of or the day following its receipt, and no entry of a like amount to the credit of the estate appeared.

It seems to be assumed by counsel on both sides that on October 15, 1923, Costigan sent testatrix a check for $1,062.50 and that this represented the semi-annual interest on the bonds claimed by Costigan and due within two weeks after the date of the letter. This check was sent to testatrix to be indorsed and credited to her account. Gosney's counsel referred to exhibits 46 and 39. In Costigan's letter to testatrix, marked Plaintiff's Exhibit 46, the number of the check for $1,062.50 is given as 11,221,346, while Exhibit 39 describes check No. 11,221,347 and must be a different check from the check mentioned in Costigan's letter of October 15, 1923. As the numbers of the bonds upon which the two differently numbered checks paid the semiannual interest are not shown on either exhibit, we are unable to be certain that counsel are correct in their assumption.

It appeared from the evidence that Costigan and Richardson, as executors of the will of Charles W. Noyes, had waived their claims to their fees as executors and that Joseph Morton, as attorney for said executors, had been paid only a nominal fee of $200. Costigan claimed the statutory fees for executing the will of testatrix and making distribution thereof. He was paid on that account approximately $31,000, and the probate court made an additional allowance of $5,000 to Morton as attorney for the executor. Concerning the legality of Costigan's fee and the reasonableness of Morton's allowance no question was raised, but Gosney insisted that Costigan should have made no claim to compensation for his services as executor, in view of his claim of ownership of the $50,000 in bonds, and that, as the estate was mainly devoted to charity and

the will provided that the trustees themselves should serve without remuneration and testatrix directed that there be no administration of her estate, if that formality could be dispensed with, Costigan should have given his service as executor without charge, as he had done in the Charles W. Noyes estate.

Gosney testified that the first he knew of Costigan's claim of ownership of the bonds was in April, 1924. He testified that, when he presented to Costigan, in January, 1924, the records kept by testatrix, they included as her property the bonds claimed by Costigan, but that Costigan then made no claim to own them. He claimed that Costigan said at that time that the record was correct, but refused to sign a statement to that effect and Gosney alone signed such a statement before the records were sealed and deposited in the Tootle-Lacy Bank for safekeeping. Defendants' evidence tended to show that Costigan was asserting his ownership of the bonds soon after the death of testatrix and before her will was filed or Gosney had brought the records with him from California, because he consulted both attorney Morton and the probate judge as to his rights in the matter before that time.

The rules and regulations of the United States Treasury Department respecting the exchange of registered bonds for coupon bonds or for transfering title of registered bonds to the personal representatives of the owners, were introduced in evidence. One of such rules required an order of the probate court where the transfer was to be made to the executor individually. It does not appear that the Treasury Department had any knowledge that the coupon bonds sent to Burnes National Bank were for Costigan individually, and not for him in his capacity as executor. Attorney Morton testified that he advised the department of this situation, but photostatic copies of his letters failed to bear out his testimony. According to Gosney's testimony, Costigan told him he was unable to fix the exact date when he took the bonds out of the box containing the securities of testatrix. When asked whether it was before or after the death of testatrix, Costigan said he had some memoranda which would fix the date. This information was never supplied to Gosney, nor was it in evidence at the trial. Costigan merely sent Gosney copies of the letters from testatrix directing him to transfer the bonds to himself. Later on Costigan referred Gosney to his attorney for information concerning the transfer of the bonds. Morton testified that this was after it became apparent that Gosney was going to institute suit for the bonds.

Both Gosney and Costigan had previously been beneficiaries of gifts from testatrix. She cancelled an $8,000 note given by Gosney, evidencing a loan to him in that amount. She had previously given Costigan $5,000 at one time and $10,000 at another. These gifts

had been promptly acknowledged by him, as shown by letters found in the effects of testatrix after her death in California.

The first four assignments of error go to the correctness of the trial court's action in admitting in evidence defendants' exhibits C, D, F and G, which were the two letters addressed to "Dear Ralph" and "Dear R. E. C." above quoted, and the two purported copies thereof. It is said that there is no proof that exhibits F and G were ever sent to Costigan by testatrix or received by him, or that the envelopes constituting parts of said exhibits and which undoubtedly were mailed by or at the direction of testatrix and received by Costigan, contained the above letters when received by him.

As Costigan was incompetent to testify as to any fact tending to establish the gift itself, we are driven to consider the surrounding circumstances to determine whether testatrix sent the letters to Costigan. There cannot be a shadow of doubt under the record before us that the letters were written by testatrix. All the evidence there is in the case upon the point shows that Costigan had the letters in his possession in St. Joseph within a few days after the death of testatrix. This was before Gosney brought the will and other papers from California to St. Joseph. There is nothing in the record to justify the suggestion made in plaintiff's brief that Costigan became possessed of the letters in some manner unauthorized by testatrix. She wrote the letters and he had them when, or at least immediately after, her death occurred and only one conclusion seems reasonable and that is that he came by them with her knowledge and consent. It, therefore, makes no difference whether she sent the letters to him by mail or got them to him in some other manner.

The fact that the letters refer to a codicil of the will testatrix had in preparation in October and that Costigan made a rough draft of the will (or codicils thereof) and sent it to her and the will was prepared in California, using such draft as a basis, and executed there November 8, 1923, indicates that Costigan had the letters at least before the will was prepared in California.

How Costigan came into possession of the copies of the letters marked exhibits C and D is not so clear. They certainly were intended to be copies of the letters, for they are so described by testatrix and they were undoubtedly in her handwriting. There could be no purpose in testatrix sending both originals and copies to Costigan. He had no greater opportunity to get the copies without authority from testatrix than he had to get the original letters. It is unlikely that he had the copies when he showed the originals to Morton, for Morton did not see the copies. It appears reasonable to believe Costigan did not have the copies at that time and that he came into possession of them later. Gosney denied finding them among the effects of testatrix, but that does not prove that Costigan

did not find them there when he examined the papers which Gosney brought to St. Joseph with him.

Our conclusion is that the letters and copies were properly admitted in evidence. Having so determined, the effect of the letters themselves must next be considered. There is not the slightest room for doubt that testatrix intended to make a gift of the bonds to Costigan. She said in exhibit F "I desire that you transfer numbers 30029 to 30033, 5 bonds, $10,000—$50,000, to your account." The reason for her desire to make the gift appear in exhibit G, wherein she said: "Thanking you again and again for your patient kindness to me" referring again to the taking over of the bonds by Costigan. Counsel intimate that this letter may have referred to one of the previous gifts testatrix made to Costigan. This seems extremely unlikely because, in both letters, she refers to the codicil she was submitting for his approval, about which she appeared to be quite concerned.

Of course, the intention of testatrix to make the gift was not enough. The gift must have been accepted by Costigan during the lifetime of testatrix. This we regard as the vital question in the case. The burden was on Costigan to show, not only that testatrix made the offer of the gift, but as well, that he accepted the gift in her lifetime. 28 Corpus Juris, page 681, lays down the general rule that gifts *inter vivos*, asserted after the subsequent death of the donor, must be established by clear and convincing evidence, particularly where, as is true here, confidential relations existed between the donor and the donee. Defendants do not controvert this general rule and it is sufficiently exemplified in the cases cited by plaintiff, to-wit, McCune v. Daniels (Mo. App.), 225 S. W. 1020; Jones v. Falls, 101 Mo. App. 536; Meyer v. Koehring, 129 Mo. 15.

We think it unnecessary to consider the evidence, except that which has a bearing upon the question of acceptance. Actual physical delivery of the bonds to Costigan by testatrix, where he already had them in his possession as her agent, was unnecessary. [Foley v. Harrison, 233 Mo. 460, 1. c. 579, 580, 136 S. W. 354.] 28 Corpus Juris, page 695, lays down the general rule that, where the gift is beneficial to the donee and imposes no burden upon him, acceptance will be presumed. This rule has been accepted by the courts of our State. [Tygard v. McComb, 54 Mo. App. 85; Jones v. Jones (Mo. App.), 201 S. W. 557.] Plaintiff has cited no authority to the contrary, and we take it that this rule is not questioned. If A makes a gift to B of a sum of money or other property upon condition that B take into his home and care for A's aged mother for the remainder of her life, the gift would be encumbered with a burden and acceptance of the gift could not be presumed and evidence of actual acceptance would necessarily be required. But the alleged gift to Costigan imposed no burden upon him, and we see

no reason why the presumption of acceptance may not properly be indulged here. Of course, if the facts and circumstances in evidence are inconsistent with acceptance on his part, the gift must fail.

There is a significant thing about Exhibit F, the letter dated October 1, 1923, which seems to us to shed quite a bit of light on Costigan's acceptance. Testatrix sent a codicil to Costigan for his approval or correction, and said: "It (the codicil) may give you an idea as to what I am wanting to have done when I have 'passed on,' except this one thing." She then recalled the fact that Costigan had sent her a memorandum of U. S. Liberty bonds registered and advised him of her desire to have $50,000 of those bonds transferred to him and to have him transfer them to his own account marked, "disposed of—a gift" *if he would rather have it so,* and he could make the transfer *now* "instead of waiting for me to 'pass over the divide.'" It seems a reasonable inference that testatrix meant that Costigan had the choice of receiving the bonds as a present gift *inter vivos* or of receiving them as a bequest under her will and that the codicil referred to him for his approval dealt with that bequest, "except this one thing," to-wit, that he could have them now "if you would rather have it so." The evidence discloses that Costigan sent out a rough draft of a new will. The will as finally drafted contained no bequest of this character to Costigan. Is it unreasonable to think that Costigan in some manner communicated to testatrix his preference of having the gift made before her death and not as a bequest in her will and that such knowledge on her part explains the absence of such a bequest in the will? If such an inference may be properly drawn, it would be evidence of acceptance of the gift on Costigan's part at that time. True, no letter to that effect was found among the effects of testatrix and Costigan wrote none, according to Gosney's testimony. But that does not constitute conclusive proof that testatrix did not learn of Costigan's desire and acceptance in some other way.

A removal of the bonds from the safety-deposit box where Costigan kept the securities of testatrix, or the formal transfer to himself of the title thereto under the rules of the United States Treasury Department, was not an essential of a good and sufficient acceptance on his part. The question for decision is, did he in fact determine to accept the offer before the death of testatrix?

While the attitude of Costigan toward Gosney's inquires concerning what was done by Costigan before the death of testatrix to complete the gift scarcely conforms to our ideas of the consideration due a co-trustee, still there is only one circumstance shown by Gosney's testimony which may be said to constitute an act on Costigan's part actually inconsistent with his claim of ownership of the bonds. That was his alleged statement concerning the correctness

of the records kept by testatrix, which failed to show any transfer of the bonds to Costigan. The time of this alleged statement was after Gosney had brought the will and the correspondence of testatrix to St. Joseph. Before that time Costigan had asserted claim to the bonds by consulting Morton and the probate judge concerning his right and title to them. The refusal on his part to certify to the correctness of the records Gosney brought with him from California testified to by Gosney, is inconsistent with his statement, also testified to by Gosney, that such records were correct. We do not think the fact that Costigan failed to offer himself as a witness to deny Gosney's testimony on the point is conclusive that he made the statement attributed to him. His refusal to certify to the correctness of the records and his previous assertion of title may have appeared to him and his counsel as sufficient refutation of the testimony of Gosney on that point.

Appellant contends that Costigan was a competent witness concerning many matters and that his failure to offer himself as a witness to explain his acts and conduct after the death of testatrix should be construed unfavorably to him. The particular insistence is that Costigan should have explained his failure to disclose to Gosney the facts bearing upon his acceptance of the gift during the lifetime of testatrix. It must be conceded that the record discloses that Costigan was not frank with Gosney concerning the facts Gosney was entitled to know, because he also was a trustee and under the duty to protect the trust estate in respect to all assets properly belonging to it.

Costigan apparently resented the inquiries of Gosney as an imputation against his integrity and honor. This attitude on his part was unjustified. But Gosney's name was added as a trustee after the rough draft of the will was sent by Costigan to testatrix for final draft and execution, and Costigan perhaps resented the insertion of Gosney's name as an intrusion and evidence of officious intermeddling on his part. Gosney early exhibited a purpose to institute legal proceedings, if Costigan insisted upon his claim to the bonds, and Costigan may have felt he should leave the burden of the attack to Gosney and not furnish him any more ammunition for such attack than absolutely necessary. While we do not approve Costigan's failure to make full disclosure to Gosney, it cannot be said that his conduct constitutes substantial evidence tending to overthrow the presumption of acceptance of an unburdened gift beneficial to himself.

The fact that the United States Treasury Department might have refused to transfer the bonds to Costigan individually does not tend to prove that Costigan did not accept the gift. If the title actually passed to Costigan by a timely acceptance of the gift, the matter of securing transfer on the records of the Government was entirely between

Costigan and the Government. He followed the advice of his attorney in securing the transfer in the way it was accomplished and, if that advice was unsound, albeit quite effective of results, his acceptance of such advice cannot be regarded as an admission of doubt on his part of his title to the bonds, which he was then and prior thereto asserting.

If Costigan did give credit to testatrix on October 15, 1923, for the full semi-annual interest of $1,062.50 paid on the bonds on that date, it does not show that he did not afterward and before her death decide to accept the gift of the bonds. Only one-half month's interest, or one-twelfth of $1,062.50, accrued between the date of the letter written by testatrix and the date of the letter of Costigan transmitting the check.

The fact that Costigan claimed his statutory fees as executor of the estate does not disprove his timely acceptance of the gift of the bonds. He was clearly within his legal rights in claiming and accepting fees allowed by law for the administration and distribution of estates. The fees were allowed and accepted long after, and in face of the fact that, Gosney had challenged Costigan's title to the bonds.

Since the gift was undoubtedly intended by testatrix and its acceptance by Costigan will be presumed because unburdened and beneficial to him, the decree of the trial court should not be disturbed unless there are facts and circumstances in the record tending to show, the presumption of acceptance notwithstanding, that Costigan did not actually accept the gift. Apparently Costigan had not removed the bonds from the safety-deposit box where he kept the securities of testatrix before her death. He did not need to do that, although he would probably have done so and would have written a letter of acceptance to testatrix and kept a copy of it had he consulted a lawyer and taken the advice he probably would have received. As testatrix was an apparently healthy old woman, her unexpected death was probably announced to Costigan before he had segregated the bonds and this fact may have caused doubt in his mind of his complete title to the bonds until he had consulted his lawyer and, even then, made him anticipative of objection on Gosney's part, after he learned of his appointment as trustee. If such were the facts, they explain much of the conduct of Costigan which is dark under this record.

There exists in this case a fact which is absent in most cases of assertion, after the death of the alleged donor, of a gift either *inter vivos* or *causa mortis*. The difference is that the intention of testatrix to make the gift is here clearly and indubitably established. The gift was beneficial to Costigan and its acceptance cast upon him no burden. Therefore, his acceptance must be presumed. He had the bonds in his possession so that no physical delivery or formal

transfer to himself was necessary. The question of fact to be determined therefore is his state of mind toward acceptance of the gift prior to the death of testatrix. It is difficult to believe that anyone in Costigan's position, where there were no direct heirs of testatrix to be injured or to make trouble for him and no cumbersome burden to be assumed, would refuse to accept such a gift. We fail to find any substantial proof of want of acceptance on his part. It is not unreasonable to think that the fact of his acceptance was conveyed to testatrix in some manner, because she made no provision for Costigan in her will, in accordance with her apparent desire in respect to the disposition of the bonds.

The treatment Costigan accorded Gosney and his want of frankness in making disclosure of facts to which Gosney was rightfully entitled are not necessarily evidence that the gift was not accepted. This attitude seems explainable on account of Costigan's evident resentment toward Gosney and his unwillingness to furnish him information in aid of the suit which Gosney suggested would be instituted.

The trial chancellor saw and heard all of the witnesses and observed their manner and appearance while testifying. He could weigh their testimony in the light of such advantage much better than this court is able to do. We are satisfied that he reached the right conclusion and that his decree should be sustained.

The judgment is affirmed. All concur.