In the Matter of the ESTATE of Irene B. HOFFMAN, a/k/a Irene Hoffman, a/k/a Irene Bickerton, a/k/a Catherine Hacke, a/k/a Catherine I. Hoffman, Deceased.

MANUFACTURERS BANK & TRUST COMPANY OF ST. LOUIS, Executor, Appellant,

v.

Dolores ARNO, Respondent.

No. 56165.

Supreme Court of Missouri, Division No. 2.

Feb. 12, 1973.

---

Allen A. Yoder, St. Louis, for appellant.

Joseph G. Stewart, St. Louis, for respondent.

RICHARD P. SPRINKLE, Special Judge.

This action began in the Probate Court of St. Louis County. It was initiated by the Manufacturers Bank and Trust Company, executor of the estate of Irene B. Hoffman, deceased, and by her surviving spouse, Oliver Hoffman.

The motivating document was an affidavit filed by representatives of the executor and by her surviving spouse, alleging that respondent Dolores Arno, a granddaughter of decedent, was in possession of certain monies which should be a part of decedent's estate and administered by the executor.

After discovery pleadings were answered and the case was at issue, the Probate Court made a determination and found in favor of granddaughter Dolores. On appeal to the Circuit Court, the circuit judge found the issues in favor of granddaughter Dolores and determined that decedent had made a gift of the disputed money to her.

The executor appeals, raising two points. First, that decedent did not make a legal gift to granddaughter Dolores and second, that the court's finding that $8,800, instead of $69,600, had been placed with Dolores, was in error.

The facts relating to granddaughter Dolores' possession of certain monies are essentially these. The decedent, Irene B. Hoffman, who was also known by several other names, died February 24, 1966. She was survived by Oliver, her husband of twenty years; a daughter, Merlie Brug; three grandchildren, respondent Dolores Arno, Catherine Barron, and Arthur Oliver; and six great-grandchildren. Decedent left an estate valued at over one million dollars.

Before her death, decedent was hospitalized for a short time (ten days) and while there she made some rather casual gifts of monies to family members. With one exception, none of these gifts is directly the subject of this litigation. However, their happening has a measure of significance in evaluating decedent's state of mind and indicating her propensity to make gifts. For these reasons, the gifts are mentioned.

1. February 18, 1966, four days after entering the hospital, decedent made a gift to granddaughter Catherine of the contents of a safe deposit box at Manufacturers Bank. Decedent was the principal owner of the box and Catherine a deputy. Decedent gave instructions that the money, about $22,800 in the box, was a gift to Catherine. She was to remove all but $300, place the money in another box in her (Catherine's) name, with decedent's husband, Oliver, designated as deputy.

2. Four days before she entered the hospital, decedent wrote a note "forgiving" grandson Arthur the balance due ($10,850) on a $22,000 note she held on his house. Several days after she entered the hospital, decedent gave the releasing instrument to a representative of the bank and granddaughter Catherine to see that her wishes were carried out.

3. Decedent also "paid off" the $5,000 balance due on granddaughter Catherine's deed of trust on her home.

4. Decedent cancelled a note and deed of trust securing $15,900 on the house of granddaughter Dolores.

5. Husband Oliver received some $50,000 to $55,000 in bonds from decedent within the year before her death.

According to the testimony, decedent apparently enjoyed making gifts and was in the habit of doing so. All the foregoing gifts are undisputed.

The contemporary event resulting in this litigation was an alleged gift made to granddaughter Dolores under circumstances similar to the first above-mentioned gift to granddaughter Catherine.

In a different bank (Mercantile), decedent maintained a separate safe deposit box. The contract for the box was initially made June 16, 1961. Decedent was owner of the box and, on May 6, 1963, decedent named granddaughter Dolores as deputy. It is inferred that Dolores knew nothing of this box or her designation as deputy until shortly before decedent entered the hospital. Thus, Dolores had no occasion to go to the bank and register herself as deputy.

On February 18, 1966, with a letter of introduction from decedent, Dolores went to the bank and qualified as deputy. The letter of introduction contains granddaughter Dolores' signature and is the document she picked up from decedent's home at decedent's direction. Therefore, at some time prior to decedent's entry into the hospital, Dolores knew of the existence of the Mercantile box. The evidence would indicate this time as being just before decedent went to the hospital when granddaughter Dolores and her husband, James, visited decedent in her home.

The prelude to the visit to Mercantile Bank includes the disputed statements regarding what decedent said about the contents of the box at Mercantile. It also appears that husband Oliver knew nothing about the existence of this Mercantile box until three days before decedent entered the hospital. At that time, at decedent's request, they opened that box and counted the contents. According to Oliver, there was $69,900 in the box. From that time until the contents were removed, after the alleged gift to Dolores, the bank records do not show any entry into the box.

On February 18, 1966, the same day decedent made her undisputed gift to granddaughter Catherine, she made the alleged gift to granddaughter Dolores. According to granddaughter Catherine, she, her sister Dolores and decedent's husband, Oliver, were present. At that time, decedent gave instructions regarding the money in the Mercantile box. She directed Catherine and Dolores to go to her house, get decedent's letter of authorization for Dolores to enter the box and the key to the box. They were then to meet husband Oliver at the Mercantile Bank. Her directions were that all the money except $300 was to be withdrawn, placed in a safe deposit box in another bank with Dolores as owner and Oliver as deputy. Granddaughter Catherine said decedent told Dolores, with regard to the money at Mercantile, "That's yours." This alleged statement of decedent is denied by Oliver.

Subsequent events, which are essential to a final determination, are rather bizarre. It is undisputed that Dolores and Catherine obtained the key and the letter of authorization. However, entry into the Mercantile box could not be accomplished that day (February 18, 1966), but was done on February 21, 1966. Catherine was not present when Dolores and Oliver went into the Mercantile Bank and Dolores signed an entry slip and they secured the safe deposit box. It is admitted that Oliver was present when the box was opened, although he did not sign the entry slip and apparently was not required to do so in order to gain entry and be present. Pursuant to decedent's directions, the contents of the box, in two brown envelopes, were removed with the exception of $300 taken out of one envelope by Oliver. The remaining money was not counted. Oliver pocketed one envelope and Dolores took the other. They left Mercantile together and, at Oliver's suggestion, went to the Bank of St. Louis. There a safe deposit box was rented in the name of Dolores as owner and Oliver as deputy. Both Oliver and Dolores deposited a brown envelope in the box and the box was locked without the money being counted. Oliver had both keys to the box, although Dolores went with a bank representative when the box was locked in the vault and she had to

have a key in order to do so. One week later, on February 28, 1966, four days after decedent's death, Dolores went to the Bank of St. Louis and revoked Oliver's deputy authority.

Two days later, on March 2, 1966, Dolores, with one Ann Barrett, her friend of some thirteen years standing, returned to the Bank of St. Louis. Dolores signed a statement that she had misplaced or lost the keys to the box and thus authorized the box to be drilled open. She executed an entry slip and, in the presence of Ann Barrett, Dolores opened the box and found only one envelope, which contained $8,800. This same amount of money was found on December 4, 1969, when the box was next opened at the time the contents were inventoried.

In dealing with the first assignment of error alleged by appellant, i. e., that defendant did not make a valid gift of the disputed money to respondent, some practical ground rules must be established.

All people are creatures of habit, and individual idiosyncracies are as numerous as people themselves. Obviously, no hard and fast rules can be set with regard to established conduct and each case must be judged on its own facts.

The average person has no precise knowledge of the legal requirements constituting a valid gift. However, in order to preserve regularity, maintain consistency and set reliable guidelines, legal authority has devised rules and imposed certain restrictions on the actions of individuals which govern what they can effectively do in making a gift. If there is a failure to meet these conditions, it must be accepted that on occasion the desires of a donor may not be carried out. This fact points up the need for skilled practitioners, familiar with the law, who can advise clients of all the requirements so they can fulfill their wishes when disposing of property.

In the matter here, decedent's intent can perhaps most accurately be judged by what she said and by what she had done in the past, which would indicate some consistency of intent. Without evidence of prior legal advice, the words and actions of the decedent must be held up to the legally prescribed formula to see if those deeds bring her within the confines of required action. This judgment must sometimes be accomplished through analysis rather than by direct evidence.

Appellant spends much of its brief in arguing the facts of the case and in making reference to evidence presented by respondent which is characterized as superficial. It should be remembered that respondent's evidence was limited by legal restrictions and by events beyond her control.

Because of appellant's objections, respondent Dolores was not permitted to give evidence regarding the events of the alleged gift. Timely objections based on the restraints of the "Dead Man's Statute," Section 491.010, RSMo 1969, V.A.M.S., prevented granddaughter Dolores from relating her story of the entire affair with decedent. Likewise, any testimony of Dolores' husband, James, regarding decedent's plans about the Mercantile box, which she may have expressed before entering the hospital, were denied Dolores. The record shows the trial in Circuit Court on February 9, 1970, and the death of Dolores' husband on January 28, 1968. Thus, granddaughter Dolores' evidence was reduced to a paucity of direct testimony on the subject of decedent's statements and desires.

Even though appellant suggests that this court should not defer to the trial court's judgment on the credibility of witnesses, especially where several oppose one, we do not care to indulge in the dangers inherent in that course of action.

Taking the testimony most favorable to the trial court's findings leads this court to substantial evidence to support the circuit judge's conclusions.

■ Appellant makes proper reference to the basic requirements concerning the establishment of a valid inter vivos gift.

The essentials were recently stated in Wantuck v. United Savings and Loan Association, Mo., 461 S.W.2d 692, 694: "They are: ' * * * a present intention to make a gift on the part of the donor, a delivery of the property by the donor to the donee, and an acceptance by the donee, whose ownership takes effect immediately and absolutely.' "

In dealing with these requirements, as applied to this case, several items of importance should be noted. Here there is no claim of undue influence on the decedent by granddaughter Dolores or anyone acting for her. There is no assertion that decedent lacked the mental capacity to make a knowledgeable, valid gift. The gift was one of negotiable currency which did not require any further act on the part of decedent to complete its passing to respondent. Decedent did not have to endorse any document or make any paper transfer. The acts and statements of decedent constituting the giving were not accomplished in shadowed seclusion during some isolated meeting where only the benefactor and recipient were present, but were open and in the presence of others.

Being mindful of these conditions and advised of the essential elements needed to make a valid gift, this court finds no quarrel with the requirements as applied to this case and the determination made.

It is true that there is conflicting evidence regarding decedent's statements to granddaughter Dolores relative to the money in Mercantile. Catherine, respondent's sister, stated decedent told Dolores about the money in the Mercantile safe deposit box and said to Dolores, "That's yours." This statement is denied by decedent's husband, Oliver, and refuted by grandson Arthur. Yet, the trier of facts, taking into account the other undisputed gifts made by decedent, the actions of the parties and in evaluating the credibility of the witnesses, cannot be said to have abused his discretion or made a determination without substantial support.

No precise language is required in order to create the gift. Conduct is an enlightening ingredient in discerning intent. See Albright v. Davis, Mo.App., 64 S.W.2d 121, 124.

The statement of decedent to Dolores, "That's yours," coupled with directions as to how Dolores could take possession of the money, certainly meets the requirements of intention and delivery. For almost five years decedent had maintained exclusive control over the Mercantile box. From all the evidence, she had sole knowledge of its existence. No one was taken into her confidence about the box and its contents until two weeks before her death. Although Dolores had been the designated deputy on the box for three years, she did not know that fact and had not qualified as deputy. Within six days of her death, decedent relinquished control of the contents of the box by giving the key to granddaughter Dolores, along with a letter of introduction, permitting her entry into the box and decedent's blessings to its contents with a simple, "That's yours." Thereafter, decedent exercised no dominion over the gift, since she had divested herself of the right to revoke the gift or any future control over it.

There can be little question that granddaughter Dolores accepted and assumed immediate ownership of the gift itself. Even without the acts of Dolores, in assuming possession, her acceptance can be presumed, since the gift was beneficial and imposed no burden on her. See Gosney v. Costigan, 326 Mo. 1215, 33 S.W.2d 947, 953.

When the term "immediate ownership" is used, it is not intended that there be an actual contemporary hand-to-hand exchange. The phrase is intended to eliminate contingency situations or the happening of some future event before ownership is vested.

This court judicially notes that February 18, 1966, was a Friday. The

record reveals that time did not permit entry into the box that day. The next banking day was Monday, February 21, 1966, the precise day granddaughter Dolores went to the Mercantile safe deposit box, extracted its contents and put them in the safe deposit box in another bank wherein she was the designated owner. It is true that Oliver, decedent's husband, was deputy and apparently had the keys to the box. However, Dolores' rights to the box were superior to his and she had the privilege of terminating his deputy authority without notice, which she subsequently did.

For the reasons stated, this court determines that the necessary elements of a valid inter vivos gift were present and no error is found in the trial court's determination of that issue.

■ With regard to the second point of error asserted by appellant, i. e., that the trial court erred in finding that $8,800 had been placed with Dolores in the Bank of St. Louis, rather than $69,600, only one question is really at issue. Who is to be believed? The disappearance of the alleged $60,800, the difference between what husband Oliver says was in the box before decedent's death and the amount later found by granddaughter Dolores, remains a mystery. There are available many avenues of speculation. To suggest some of these possibilities in a public writing would unfairly cast suspicion on the innocent and providentially provide the guilty with cover from detection. The credibility gap was closed by the determination of the trial court. At this juncture, the techniques of trial and the mechanics of appeal are not yet so refined that we can deprive the trial court of its exclusive evaluation of the credibility of witnesses. Thus, we defer to the trial judge's findings on this issue, which tacitly encompass his appraisal of the witnesses' testimony.

Finding no error, the judgment is affirmed.

All of the Judges concur.