GRAVNING, Appellant, v. OLSON, et al, Respondents.

(252 N. W. 13.)

(File No. 7460. Opinion filed December 29, 1933.)

*Philo Hall* and *Walter Aaberg,* both of Brookings, for Appellant.

*Walter A. Gronna,* of Clear Lake, for Respondents.

WARREN, J. This is a suit in equity in which the plaintiff seeks to have the courts enforce an oral contract or agreement to adopt the plaintiff and make her their sole heir, which was entered into in September, 1913, between Anna Olson Munson, the plaintiff's then unmarried mother, and Iver and Bertha Sandland. The plaintiff at the age of three was left with the Sandlands during the absence of her mother. Here she remained until she reached the age of eight, when the Sandlands, being advanced in age and childless, both signified their intention and desire to adopt the child Martha as their daughter to aid and comfort them in their old age and in return therefor would make her their heir. The natural mother of Martha was contacted and consented to such an adoption, and on the 31st of July, 1918, the court accordingly issued an order of adoption to Iver Sandland, whereby he became the adoptive father of appellant. His wife, Bertha Sandland, consented to the adoption by signing the papers. Iver Sandland died in July, 1927, and Bertha, his wife, in February, 1930. The plaintiff began an action by which she sought to have the court confirm and specifically enforce the contract between plaintiff's natural mother and the Sandlands, and decree the plaintiff to be the adopted daughter of Bertha Sandland, deceased, and entitled to

her entire estate, real and personal. The trial court found for the defendants, and the plaintiff has appealed.

The respondents' main contention is that the adoption proceedings as to Bertha Sandland, decedent, were invalid for the reason that the said decedent did not adopt the plaintiff, but merely gave her consent to the adoption. The trial court found that there was no adoption as to Bertha Sandland and also that there was no contract or agreement entered into between the decedents and appellant's natural mother.

The appellant in her assignments of error urges that the trial court, notwithstanding the uncontradicted evidence of the existence of said contract, erred in finding no contract or agreement was made or entered into whereby said Bertha Sandland agreed to adopt said Martha Sandland Gravning and that no contract or agreement was made or entered into by the said Bertha Sandland whereby the property of said Bertha Sandland, or any part thereof, should go to Martha Sandland Gravning. We believe that the trial court may have been so thoroughly embued with the thought of an invalid adoption that it may have inadvertently overlooked the oral contract or agreement as did the trial judge in the case of Godine v. Kidd, 64 Hun, 585, 19 N. Y. S. 335, 337, where the court, in speaking of an invalid adoption, said: "We think, however, that the learned trial judge was unduly influenced by a consideration of the provisions relating to statutory adoption in determining the question presented for his consideration. It was not one as to whether there had been a formal adoption pursuant to some law or statute, which would have entitled the defendant by virtue thereof, as an adopted child, to succeed to the property of the adopting parents; but, as already said, the question was whether an agreement such as has been here established can be enforced in equity."

While respondent's contention of the invalid adoption is strong, yet we must deal with the fact that there existed an oral contract, a fact which is undisputed by the evidence, between Anna Olson Munson, appellant's natural mother, and Mr. and Mrs. Sandland. The fact that such a contract existed was testified to by Mrs. Munson and her sister, Mrs. Bjerke. We quote excerpts from the testimony of Mrs. Munson in regard to such a contract: "She (Mrs. Sandland) talked to me then like she wanted to take Mar-

tha, told me wanted to keep her. She told me she did not have any children of her own, like to have Martha as her own if I would give her up. This conversation took place at the home in Toronto, South Dakota. I told her yes, I would leave her there. There was something spoke at that time about her adopting her. Like to adopt her later on. Said Martha should have all the property they had when she died. When Mrs. Sandland died, Mr. and Mrs. Sandland. I said I would give Martha up to her, what I said. I did give Martha up to her at that time, only did not make the paper out yet. In giving Martha up to her at that time, I relied upon her statement that she had made to me that they would later on adopt her and when they died (the Sandlands) that Martha would get all of their property. After that conversation and agreement with Mrs. Sandland, I never at any time took Martha back. I turned her over to Mrs. Sandland. At that time Martha was about three years old. I surrendered Martha absolutely to the Sandlands at that time, in reliance upon this adoption of both of the Sandlands as I understood it. * * * In surrendering Martha to the Sandlands, as their daughter, I thought it would be better for the girl as I knew she would have a good home. I took into consideration the agreement that they would adopt her and leave her all their property, and believed that it would be for the best interest of Martha. She would have a good home, and I turned her over, and have never had anything to do with her since. I have kept my agreement so far as I am concerned."

Mrs. Bjerke, Mrs. Munson's sister, testified in part as follows: "In 1918, when they came to our place on a Sunday, that is the Sandlands, Mr. and Mrs. Sandland, and they had Martha with them, and they asked me to try and find my sister. They said they wanted to find the natural mother so she could sign papers because they wanted some legal protection for the girl in case of their death. They said they wanted to adopt her. I told them where my sister was. I knew she was in Garretson, but I did not have her address. I had to hunt her up. I went down there and finally found her. * * * They came to our place coming back from Clear Lake, and told me the papers were made out. They went down up there and get the papers made out and they were glad it was done, and were thankful for the trouble I had taken for them. * * * In these conversations I had at the time I got my

sister to come to Garretson, Mrs. Sandland done most of the talking because she was more of a talker than he was. As near as I can remember, she said she would like to have those papers, being they were old and did not know what would happen to them. She did not say in so many words what they wanted to do with their property when they died, but she said lots of times later on, later on she said all that was left that was supposed to go to Martha."

The Sandlands were advanced in years and had no children. Both of them had accumulated considerable property. They were living in a small-town, and no doubt both of them craved companionship, and it would seem that when the little girl was placed in their care while her natural mother made a short trip, the desire to have a child in their home was greatly increased. When the natural mother returned the matter was taken up as to letting them have the child, adopt it, make it their own child that they might have the companionship and enjoyment of the child's society, and it seems most natural that it was the desire of both Mr. and Mrs. Sandland that this child, who was to receive their affection and love, should also inherit all of their property. Previously we have alluded to the conversations that took place both between the mother and Mrs. Sandland, and also with Mrs. Bjerke, Mrs. Munson's sister. It all clearly points to the fact that the Sandlands wanted this child as their own. That such was their desire is again forcibly brought to our attention by the Sandlands making a search for the natural mother by first visiting the sister and asking her to continue the search for the mother. When she had been found and brought to them pursuant to such contact by her sister, the Sandlands, to make sure that appellant might be their adopted daughter and inherit their property, consulted with the county judge and had him draft the papers, which were thereafter executed and filed, in order to accomplish the purpose of adoption. While the record does not disclose the fact that these people were unable to read, write, or understand our language, yet like so many people who are not familiar with the drafting of legal papers or with the legal terminology used in courts, they naturally believed that the persons employed to draft the papers would do so without any further effort upon their parts. Certainly it may be conceded that had the Sandlands read the papers closely they might have discovered that only Mr. Sandland was made the adoptive

parent. After the adoption proceedings, Mrs. Sandland expressed to the sister of the natural mother her appreciation of what she had done to bring about the meeting of the mother with the Sandlands so that the child might be adopted by them, and at this point it is well to observe that in all the testimony given by witnesses quoting Mrs. Sandland, it is stated that she used the plural term when speaking of "their daughter." That they always spoke of her as their daughter, treated her as if she were their own child, and intended her to be their heir, was testified to by six witnesses who were close friends of and well acquainted with the Sandlands and were well in a position to view the close bond which existed between the appellant and the Sandlands. Each of these witnesses testified to the fact that the Sandlands spoke of appellant as "their" daughter; that Bertha Sandland had stated that appellant was to have all of their property upon their death; and that a great affection existed between appellant and the decedents. That Mrs. Sandland felt certain that the child had been adopted by herself as well as Mr. Sandland is clearly corroborated not only by her oral statements but also by the written consent to marriage which she signed and in which consent she described herself as "foster-mother and parent of Martha Sandland" and said "the said Martha Sandland being a legally adopted daughter of myself and Iver G. Sandland, now deceased." There are also the letters which she wrote to appellant and which are in the record before us. It seems to us that there can be no doubt as to the intent to adopt and that there was a contract fully executed by the child, the appellant, herein, that she should inherit the property of the Sandlands.

The findings of the trial court are at their best simply a negative statement that no contract existed between the parties which could be specifically performed for the conveyance of the property to the appellant herein. That finding and conclusion thereon may have emanated from the trial court's earlier conclusion that no adoption had taken place and that therefore the appellant could not inherit the Sandlands' property. It is quite manifest, however, under the pleadings and the evidence in this case that the appellant is not seeking to recover under the written contract of adoption. In fact, appellant apparently concedes that the legal documents did not make Mrs. Sandland one of the adoptive parents, but she does insist that, and properly contends that, it was the intention

that she was to be legally adopted and that she should be made their heir. The evidence before us seems strong and preponderates quite conclusively to the effect that there was an oral contract executed to make the appellant heir of both of the Sandlands, and that while the contract of adoption failed in that it is not expressed in writing and acted upon by the court so far as Mrs. Sandland is concerned, yet we are fully convinced that the weight of authority and reason preponderates in favor of the position that the contract in the case at bar was such an one as a part performance will relieve from the operation of the statute of frauds; that there was a full performance of the contract on the part of the appellant; and that such a part performance by her did so take it out of the operation of the statute of frauds. We are further fully satisfied that she had a right to bring the action to enforce the contract made for her by her natural mother and that the proof of the contract was sufficiently clear, definite, satisfactory, and unequivocal to call for its enforcement in a court of equity in the exercise of its discretion. Kofka v. Rosicky, 41 Neb. 328, 59 N. W. 788, 25 L. R. A. 207, 43 Am. St. Rep. 685.

Regardless of the findings of the trial court, we feel that there is sufficient evidence that there was a contract in contemplation between the parties, which expressly provided not only that the appellant should be adopted by them, but also that she should receive their property at their death. Under such a contract the right of appellant did not depend upon the success or failure to have the adoption papers completed in court nor upon the laws of descent, but would be fixed and determined by the contract, and such rights would attach to the property of the decedents by virtue of the said contract made by them in their lifetime and created a claim of title to the property adverse to respondents' claim of title by virtue of the laws of succession and inheritance. See Odenbreit v. Utheim, 131 Minn. 56, 154 N. W. 741, L. R. A. 1916D, 421 and annotations.

Various courts have held that where there was an alleged contract to adopt and also to will to the adopted child the property possessed by the adoptive parents at the time of their deaths, and that when the parol agreement relied upon by the complainant has been completely performed, so that the deceased in his lifetime received and enjoyed all the benefits for which it was given, then

the contract can and will be enforced. See Quinn v. Quinn, 5 S. D. 328, 58 N. W. 808, 49 Am. St. Rep. 875; Signiago v. Signiago (Mo. Sup.) 205 S. W. 23; Winne v. Winne, 166 N. Y. 263, 59 N. E. 832, 834, 82 Am. St. Rep. 647; Wright v. Wright, 99 Mich. 170, 58 N. W. 54, 23 L. R. A. 196; Godine v. Kidd, 64 Hun. 585, 19 N. Y. S. 335; Dillman v. Davison (Mo. Sup.) 293 S. W. 505; Remmers v. Remmers (Mo. Sup.) 239 S. W. 509; Mc-Cary v. McCary (Mo. Sup.) 239 S. W. 848; Craddock v. Jackson (Mo. Sup.) 223 S. W. 924; Rauch v. Metz (Mo. Sup.) 212 S. W. 357; Fisher v. Davidson, 271 Mo. 195, 195 S. W. 1024, L. R. A. 1917F, 692; Lynn v. Hockaday, 162 Mo. 111, 61 S. W. 885, 85 Am. St. Rep. 480; Grantham v. Gossett, 182 Mo. 651, 81 S. W. 895; Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270.

In Holloway v. Jones (Mo. Sup.) 246 S. W. 587, 591, the court said: "This court has consistently held that he who has taken possession of a child in the capacity of an adopting parent cannot escape the duties and liabilities incident to that capacity by failing to follow the forms that the statute has prescribed to that end. * * * It is unnecessary that the word 'adopt' should be used in connection with the incurring of such liability, and the maintenance of the relation may of itself be sufficient evidence, in equity, upon which to rest the resulting obligations. In Lyon v. Hockaday, supra, we said: 'But since the statute has made the adoption of a child lawful, the law, for the same reasons that it sometimes enforces oral contracts affecting real estate, will not allow the mere failure of one party to do his duty to work an irreparable wrong to one who has fully performed his part. This court, for that reason, has not only held an oral contract for adoption valid, but has also required fulfillment of a collateral agreement of the adopting parent to leave the adopted child his estate at his death. Sharkey v. McDermott, 91 Mo. 647 [4 S. W. 107, 60 Am. Rep. 270].' "

The case of Winne v. Winne, supra, is greatly similar to the instant case. In that case the court specifically enforced an oral agreement to take a child and maintain him as the promisor's own, and at the death of the promisor to give him her property and make him her sole heir. Upon the question as to the consideration to support the agreement, the court said: "This was not a

contract in the nature of a testamentary disposition of the decedent's property. On the contrary, it was a contract to be chiefly executed during the life of the decedent, with compensation to be made at her death. It was a method adopted to provide for the payment by her for the custody, control, and services of the plaintiff during his minority. It may be observed, in passing, that the decedent, before her death, received the full consideration provided for by the agreement. The plaintiff was a considerate boy, discharging all the duties that a faithful son owes his parents. Not only during the years of his minority, but even after his marriage, he continued to provide for and exercise that care over her which a dutiful child should. The plaintiff's mother also surrendered up to the decedent the entire custody and management of her child, and 'had nothing more to do with him.' Thus both the plaintiff and his mother have fully performed the contract upon their part, so that, as to them, it is not executory, but has been fully executed. That there was sufficient consideration for the agreement, we have no doubt."

The court, in the case of Van Tine v. Van Tine (N. J. Ch.) 15 A. 249, 1 L. R. A. 155, in dealing with an agreement to take a child and bring it up as the promisor's own, said: "The obligations of parties to each other are ascertained as well by what they say as by what they do; admissions often giving the best and truest interpretation to contracts previously entered into, or doings, showing what has previously been agreed to be or promised should be done. When Mrs. Stryker, being childless, said to her brother Peter, the father of Jessie, that she would take Jessie and would treat her as her own child, she meant just what she said both in law and in conscience. She meant that Jessie should have all the benefit of the relation of parent and child. If individuals are ever to be taken at their word, and held to it by the courts, surely they should be so taken under such circumstances as are here presented. How can the court say that Mrs. Stryker did not mean just what she said? And how can it say that she did not, by what she said, most fully and distinctly bind herself to perform all the obligations of a parent towards a child towards Jessie? And were not those obligations, so made, of the same force as she would have been under to a child of her own loins? I cannot see how obligations so voluntarily assumed by a citizen, so affecting the highest wel-

fare of an infant of the tenderest years, can be regarded as otherwise than the most sacred and binding. There was part performance of the obligation."

The appellant, among her assignments of error, urges that the court erred in refusing the estoppel of the collateral relatives from denying said contract for adoption and heirship. There is no testimony within the record which evidences any intention on the part of the decedent, Bertha Sandland, to leave her property, or any portion of it, to any one but appellant. In fact, all of the witnesses for the appellant testified to the fact that Bertha Sandland, deceased, always stated that appellant was to have all of decedent's property upon her death. The very fact that Iver and Bertha Sandland desired to adopt a child indicates to us that they desired to leave an heir to their property and that such heir should not be in the persons of the respondents or any of them. In Pugh v. Cox, 185 Wis. 33, 200 N. W. 686, 687, we feel that the court has expressed a view which is sound in principle in regard to an action by the relatives of a deceased person to bar an adopted son or daughter from inheriting such decedent's estate. In that case the court said: "While the order of adoption is void, and probably is not efficient to vest the adopted child with any interest in the estate of the adoptive father * * * a court of equity will not lend its assistance to those whose only interest in attacking the adoption proceedings, in the language of the California court 'is to defeat the relations, which the adoptive parents always recognized and never questioned, so that they may succeed to an estate from which, by the very fact of adoption, the adoptive parents intended they should be excluded in favor of the adopted child.' Estate of McKeag, 141 Cal. 403, 74 P. 1039, 99 Am. St. Rep. 80. He who implores the aid of a court of equity must come with a plea sounding in better morals and appealing more to conscience than does that of this petitioner."

See, also, Burns v. Smith, 21 Mont. 251, 53 P. 742, 69 Am. St. Rep. 653, 660.

We feel that the evidence is sufficient to support the claim of appellant that the contract as alleged was made and substantially performed on the part of appellant. As performance of the contract we have the fact that there was a surrender of the custody of the child Martha by her mother to the Sandlands, the carrying

out of her part of the contract by her rendering services and social enjoyment to them for a period of some fourteen years, and even after she married, with the written consent of Mrs. Sandland, she returned and gave further service to Mrs. Sandland for approximately a year and a half. There is also the evidence in which the Sandlands agreed to adopt Martha and treat her as their child and to leave her their property. All this was satisfactorily shown both by oral statements and statements in writing which showed that the Sandlands considered appellant their adopted child and should inherit their property, and there being nothing inequitable in the performance of the contract, it should be enforced. See Hickox v. Johnston et al, 113 Kan. 99, 213 P. 1060, 1061, 27 A. L. R. 1322 and annotations on specific performance at page 1325 therein.

We have reviewed and are familiar with the authorities cited by respondents to the effect that the findings of the trial court will not be disturbed unless there is a preponderance of the evidence against such findings, and we believe in the adherence to that rule. We are not departing from that rule in arriving at our conclusions for the reason that, as stated in the earlier portion of this opinion, the trial court undoubtedly and inadvertently overlooked the oral contract and agreement to convey the property in question from the Sandlands to the appellant herein. We feel that the evidence so strongly preponderates in favor of the appellant that the findings and conclusions of the trial court must be disturbed and set aside.

The judgment and order appealed from are reversed.

POLLEY, J., concurs.

RUDOLPH, P. J., concurs in result.

CAMPBELL and ROBERTS, JJ., dissent.