FREDRICK, Respondent, v. CHRISTENSEN et al., Appellants

(39 N. W.2d 529)

(File No. 9072. Opinion filed October 27, 1949)

Rehearing denied November 22, 1949

**E. V. Morrill,** Sturgis, for Defendants and Appellants.

**Thos. G. Wall,** Sturgis, for Plaintiff and Respondent.

RUDOLPH, J. Plaintiff brought this action to enforce an alleged oral contract wherein it was agreed that plaintiff should inherit and succeed to the property of John and Clara Fredrick upon their death. The trial court determined that the contract in fact existed and gave effect thereto. The defendants have appealed.

Plaintiff was legally adopted by John and Clara Fredrick in 1910. The basis of plaintiff's claim is that the consent of plaintiff's father to the adoption was given in consideration of the oral agreement that plaintiff would become the heir of the Fredricks and receive the Fredrick property upon the death of John and Clara.

█ The principal contention of appellant is that the evidence is not sufficient to sustain the finding of the trial court that the contract was made. The rule is established in this state that one claiming the benefit of contract such as the alleged contract in this case has the burden of establishing it by evidence so clear, cogent and convincing as to leave no reasonable doubt as to the agreement. Rhode v. Farup, 67 S.D. 437, 293 N.W. 632; Walsh v. Fitzgerald, 67 S.D. 623, 297 N.W. 675; Crilly v. Morris, 70 S.D. 584, 19 N.W.2d 836. The trial court summarized the testimony in a memorandum opinion as follows:

"Let us then consider the facts in this case as they come from the lips of those who participated in the transactions and conversations which culminated in the legal adoption of Freddie Eugene Secrest 38 years ago by John and Clara Fredrick.

"In 1910, John Fredrick was a man about fifty years old. He was the 'Grasshopper Jim' of early Black Hills days, and a contemporary of 'Calamity Jane,' 'Poker Alice,' and 'Wild Bill' Hickok, and one of the lesser luminaries of early Black Hills days. He was a hard man, of questionable integrity and virtue, and generally looked upon in the community as being possessed of a violent and uncontrolled temper. His wife was considerable younger, being at the time about 35 years of age. The couple were childless and apparently recognized that they always would be. Clara Belle Fredrick seems to have been a gentle, kindly woman, with a thwarted but highly developed maternal instinct.

"At the time this story begins, the Fredricks were living on a small ranch on Spring Creek, near Bear Butte, in Meade County, not far from Sturgis. Living in the neighborhood were Eugene Secrest and his wife, young married people not more than 21 years of age. To them had been born in 1908 an only child, Freddie Eugene Secrest, the plaintiff in this suit. The Secrests were poor people, dependent for their existence on his casual and unskilled labor. The country was new and raw, and in the process of settlement by homesteaders. In the summer of 1909 the young wife died. Unable to care for his little son, he entrusted him to his wife's brother, Howard Baker, who, with

his wife Marie and infant daughter, lived in the general vicinity. He himself lived and worked with Baker much of the time, although he had a rented cabin on Nine-Mile Creek, where he lived alone after his wife's death.

"In the winter of 1910, commencing in January and until about the first of March, Eugene Secrest and Howard Baker, working together, were baling hay for John Fredrick and hauling it to Fort Meade. Mrs. Baker, with her baby daughter and Freddie, were with them, and she was doing the cooking for the balers. The Bakers and Secrest were, during the baling and hauling operations, living in a cabin or small house on the Fredrick place, about 40 or 50 feet from the main house occupied by Mr. and Mrs. Fredrick. The two women, Mrs. Baker and Mrs. Fredrick, visited back and forth several times each day, and in the evenings after work all of the people before mentioned frequently were together in the Frederick home.

"Mrs. Fredrick developed a strong attachment for Freddie, and much of the time kept him at her home and cared for him there. On these evenings when the Bakers and Secrest, together with the children, were in the Fredrick home, Mrs. Fredrick expressed to the others, including her husband, her wish to adopt the child, and persistently argued and urged to the Bakers and Eugene Secrest, not only her desire and need for the child, but as well the advantage which would result to the child if the father would consent to his adoption by them. These conversations and Mrs. Fredrick's insistence on adoption were frequent, and followed the general pattern of promises as to what she and her husband could and would do for the child if only his father would consent to their legal adoption of him. Howard Baker and his wife relate these promises in this language:

" 'They wanted to adopt him as their own, educate him, and take care of him, the same as their own, and when they passed away, he would get everything they had; everything they owned.' (Dep. Marie Baker, P. 23.)

" 'That they wanted to adopt him as their own child and give him everything when they were gone.' (Dep. Marie Baker, P. 24.)

" 'She said she wanted him as her own, to raise him and give him everything she had and when she died to give him everything she had, and on that occasion told Mr. Secrest she wanted him; that she could take better care of him, and give him more.' (Dep. Marie Baker, P. 24.)

" 'She constantly said she loved the baby and wanted to keep him, and she didn't have any children of her own, and when they had gone, he would get everything they had. She was asking for the boy to be adopted to her, and night after night she would ask us if there was any way she might get that boy by adopting him. She said if Secrest would adopt that boy to her that she would raise him as her own child, and educate him, and when they passed away he would become the only heir to their estate and that he would get it all; that they would never have any more children and he would be the only heir.' (Dep. Howard Baker, P. 5.)

" 'The day we left there with the boy she said she would like to adopt the boy and by all means she would raise him as her child, and she would give him a good education and when they were through with the property he would get it all and everything they had.' (Dep. Howard Baker, P. 6.)

" 'The conversations about they wanted to adopt the child took place very often. When we wanted to put the child to bed we would have to go and talk to them, and every time we went to get that boy she was begging for him, and she made the promises I have testified to about the inheritance, the property, many time.' (Dep. Howard Baker, P. 8.)

" 'That if Secrest would allow her to adopt that child she would raise him as her own child and educate him and keep him as her own child, and when they were through with their property he would get anything they had.' (Dep. Howard Baker, P. 15.)

" 'She told us many times he would be the only heir they would have, and she knew of no other heirs.' (Dep. Howard Baker, P. 16.)

"Mrs. Lois Bovee, age 78, who was an aunt of Mrs. Eugene Secrest, testified that, at her home on Spring Creek,

in Meade County, prior to the legal adoption proceedings, with John and Clara Fredrick, Eugene Secrest, and herself present:

" 'There was talk about the adoption of Freddie in which both Mr. and Mrs. Fredrick said they would adopt this boy, give him a good education, and when they died all their property would revert to this boy. They told that to Mr. Secrest, and Mr. Secrest told me he wouldn't adopt him under any other conditions because he wanted a good home for the boy. Later, when Freddie was about four years old I had a conversation with John Fredrick, and he told me what a smart boy he was and how they liked him, and he said, "It will be only a little while until he can go to school, and we expect to send him to college if he wants to go, and educate him, and when we are through with our property it goes to Freddie." I had a talk with Mrs. Fredrick a few months after the adoption, and she brought up the subject of Freddie's adoption, and told me they expected to raise him as their own, educate him, and when they died, he was to receive all their property; and she said that Eugene Secrest wouldn't adopt him to them unless they made those agreements: that they were to raise him as their own, give him a good education, and when they died, he was to receive all their property.'

"Gena Gullickson, who was a near neighbor of the Fredricks, says that during the time the negotiations for Freddie's adoption were being had, Mrs. Fredrick told her at different times that they would like to get him, and in reference to a later conversation said:

" 'One day Mrs. Fredrick came over to my place all smiles and said they had adopted the boy and had papers on him, and he would be like their own, and it surprised me, and I said, well, I couldn't see how a father could give away his little boy. Oh, she said, he was a poor man. He didn't have anything, and he figured they could do more for the boy than he could. They would send him to school, and when they were gone, he would get what they had. She said they would never have any children of their own. She said she was past that age, and they had been married

15 years, and this was such a nice little boy, and they would like to have him.'

"All of these conversations occurred more than 38 years before the trial, and the fallibility of the human mind to retain the exact language used must be recognized and the testimony weighed with that in mind. The probability is that much of what was said has been forgotten and much that is remembered was never said in the exact language now used by the witnesses. But this much is corroborated by the silent, undisputed facts and circumstances: A childless woman had found an object for her maternal affection—a two-year old, motherless boy; she wanted him to raise and love in his babyhood and in return to have his love and comfort in the dreary years of her old age. She was dealing with the father of that child, and, to an extent, with the Bakers, who, having its care, were naturally interested in its welfare. Both the father and the Bakers seemingly approved of Mrs. Fredrick as a person and prospective mother for Freddie, but as much disapproved of John Fredrick as an adoptive father for the child—and that they had good reason for distrusting him and doubting his suitability as an adoptive father for this child is more than supported by the undisputed evidence as to the treatment he subsequently gave the boy in the years that followed.

"This reluctance on the part of both the father and the Bakers to entrust the child to the Fredricks in adoption was sufficiently pronounced so that we may assume a considerable amount of argument and persuasion was necessary to overcome it. Months passed during these negotiations before legal adoption was had.

"Measured by all the circumstances, it is entirely reasonable to now assume that every inducement which was within the power of Mrs. Fredrick and her husband to make would be offered to these reluctant relatives to obtain their consent to the adoption. The Bakers were, respectively, the aunt and uncle of this child—Howard Baker being of the blood. They had had the care and custody of the boy for at least six months and, so far as the record discloses, were able and willing to continue their care of him until such time as his father might establish a new

home with a new wife and be able to resume the care of the boy.

"The witnesses say that Mrs. Fredrick, with her husband's passive if not active approval and assistance, offered every inducement at hand to secure consent to the adoption, including the promise of ultimate inheritance. While the Fredricks were not particularly well-to-do by ordinary standards, they were, in comparison with Eugene Secrest and the Bakers, in affluent circumstances and with visible property. What more natural than that they, having no children of their own and wishing to adopt this boy, should promise to do something which would in reality cost them nothing; that is, give him their property when they died? By so doing, the father's consent to the adoption could be obtained, and Mrs. Fredrick could satisfy her maternal instinct, and, as the facts so clearly show, John Fredrick, himself crippled and well past the prime of life, would acquire someone to labor for and support him in his declining years at no outlay of money on his part. Without the promise of heirship they could offer no inducement which could tempt the father to deliver his boy to John Fredrick. Every probability shouts that such an offer and promise as is testified to by these people was actually made. Every fact and circumstance surrounding the adoption and since corroborates the substance of the testimony of these witnesses that the Fredricks solemnly promised and agreed to give their property to this boy when death should have called them both. That this promise was relied upon by Secrest and was the controlling factor in gaining his written consent to the adoption and inducing him to take the child from the Bakers to give him to the Fredricks is well supported by the evidence."

■ We have studied the transcript of the testimony and find that it amply supports the views expressed by the trial court and the findings that were made. The trial court elected to believe in substance the story of the making of the contract as related by plaintiff's witnesses. No witness testified that the contract was not made. The testimony disputing the making of the contract was that of the lawyer who prepared the adoption papers, who could testify only

that he was not advised concerning a contract relating to inheritance. It further appears that when the lawyer was consulted he was informed that the consent of the father had been obtained. There was also the testimony of the lawyer who prepared the will but this related to a time more than thirty years after the adoption proceedings and the time the alleged contract was made. The witness testified only to the effect that Mrs. Fredrick expressed a desire to leave nothing to her adopted son. This testimony cannot overcome the finding of the existence of the contract, when we accept, as we must, the weight given by the trial court to the testimony of the witnesses who were present and heard the conversations which establish the oral contract. Giving verity to the testimony of plaintiff's witnesses leaves no doubt under this record as to the making of the contract.

██ Under the rule announced in the early case of Quinn v. Quinn, 5 S.D. 328, 329, 58 N.W. 808, 49 Am.St.Rep. 875, the alleged parol agreement between plaintiff's father and the Fredricks, after performance on the part of the plaintiff, is not affected by the statute of frauds, and parole evidence in support of such agreement is admissible. Since the Quinn case this court has given effect to similar oral agreements relating to inheritance where there was no legal adoption but only an agreement to adopt. Gravning v. Olson et al., 62 S.D. 139, 252 N.W. 13; Rhode v. Farup et al., 67 S.D. 437, 293 N.W. 632; Walsh v. Fitzgerald, 67 S.D. 623, 297 N.W. 675; Crilly v. Morris, 70 S.D. 584, 19 N.W 2d 836. In each of these last-cited cases the agreement resulted in the adopted child becoming the sole heir who became entitled to the whole of the estate of the foster parents. We mention this fact because it has been held that an agreement to make an adopted child the sole heir will not be enforced in a court of equity after the death of one of the parents if the other has remarried. Bedal v. Johnson et al., 37 Idaho 359, 218 P. 641. The contrary has also been held in Van Duyne v. Vreeland, 12 N.J.Eq. 142. We believe the contract here concerned must be construed in the light of the circumstances existing at the time the contract was made. At the time of the adoption John Fredrick was about

fifty years of age, and Mrs. Fredrick about thirty-five. They were childless and had no hope of having children. No one contemplated any change in the status of either Mr. or Mrs. Fredrick, with regard to marriage or children, and there was no change. What effect should be given to the contract had there been a change of status we need not determine. However, we do not belive that it was within the contemplation of any of the parties that the agreement constituted a restriction upon the right of Mr. or Mrs. Fredrick to remarry in the event of the death of either and to provide for children in the event such marriage was fruitful. Under the South Dakota decisions above cited, and under the facts here presented the contract was an enforceable obligation not subject to being defeated by the execution of a will disposing of the foster parents' property in contravention thereof.

■ Appellant further contends that the evidence fails to show that the plaintiff performed his part of the alleged contract. The trial court expressly found that the plaintiff did perform. We are of the opinion that the evidence on this issue so clearly preponderates in favor of the court's finding that we deem discussion unnecessary.

■ Appellant also contends that the complaint in the action contains "inconsistent and contradictory allegations." There is some foundation for this contention but the complaint does expressly allege the contract of inheritance, and this was the issue tried and determined by the court. There was no objection to any of the evidence upon this issue, and although we are of the opinion the issue was raised by the complaint, under our present practice the issue having been tried without objection it is treated in all respects as if it had been raised in the pleadings. SDC 33.0914.

■ ■ Under the rule announced in Quinn v. Quinn, supra, there is nothing inconsistent in the adoption of the plaintiff, and the contract of inheritance as found by the trial court. In the absence of such contract the adoption in itself would not, of course, prevent the foster parents from disposing of their property by will to others than the adopted child. But under the holdings of this court, and courts

generally, the contract of inheritance does deprive the parents of such right, after full performance on the part of the child.

The judgment appealed from is affirmed.

All the Judges concur.