[Civ. No. 4524. Fourth Dist. July 7, 1953.]

KERMIT E. WOOD, Respondent, v. GEORGIA B. WRIGLEY, Appellant.

Clarence Harden for Appellant.

William S. Warden for Respondent.

BARNARD, P. J.—This is an action for damages for breach of an alleged agreement to convey certain real property to the plaintiff by will.

The plaintiff, who lived in Illinois, is the nephew of the defendant, who lived in California. In November, 1941, the defendant acquired by inheritance 80 acres of land in Illinois, which was known as "Westland." The plaintiff, and his brother George, owned and operated 80 acres across the road from defendant's land. In November, 1941, under some arrangement between them, the plaintiff took over the management of defendant's land. He established a bank account in Illinois in the name of the defendant with himself as trustee, and deposited half of the proceeds from the crops on her land in this account. He wrote checks on this account for expenses on her land, and also drew on that account for his personal use without her knowledge. At the end of each year he sent her a book which he kept, showing the income, expense and balance for that year, which she examined and returned. The report for 1948 showed a balance in her favor on January 1, 1949, of $1,364.97.

In April, 1949, the defendant went to Illinois and discovered that there was only $73.69 in this bank account, that the plaintiff had been drawing on this account for his personal use, and that he had not paid the taxes for the preceding year, which he had told her he had paid. She changed the bank account, secured from the plaintiff the checkbooks and stubs from 1945 on, took the management of the land from him, and told the plaintiff's brother George what she wanted him to do on the land. In October, 1949, she sold the land. On January 14, 1950, the plaintiff wrote to the defendant saying, "I wish to settle up with you and would appreciate it very much if you would notify me as to how we stand at the present time." She replied to this letter on January 19, 1950, saying that he had the book "recording our business transaction"; that his statement on January 1, 1949, showed a balance of $1,364.97; that the balance at the bank on May 3, 1949, was $73.69; that this should have left a balance due her of $1,291.28; and that "If there is anything else due you have a record of it."

The plaintiff brought this action on August 24, 1950. The complaint alleged, in part, as follows:

"That during the year 1942, the plaintiff and defendant contracted and agreed as follows: that during the lifetime of the defendant, the plaintiff should and would operate, manage, and oversee the cultivation, maintenance and tenancy of said real property, and would manage and keep account of the income and expense of such operations for and on behalf of the defendant; that as consideration for the covenants and agreements of the plaintiff as aforesaid, the defendant promised and agreed to convey said real property to plaintiff in fee simple by will at the time of defendant's death; and that the contract and agreement of defendant, as aforesaid, was evidenced by notes and memoranda in writing and subscribed by said defendant."

It was also alleged that the defendant had sold the land and thus made it impossible for her to perform her agreement to will it to the plaintiff, that the property was worth $8,000 at the time it was sold, and that the plaintiff had been damaged in that amount. The answer of the defendant denied that the contract and agreement alleged in the complaint was evidenced by any note or memorandum signed by the defendant. It also alleged that the agreement referred to was an oral one, and that the plaintiff had also agreed to use the income from the property to liquidate the mortgage debt thereon; that the agreement of the defendant to leave this property to the plaintiff by will was conditioned upon the agreement that said income would be used to liquidate the debt; that the plaintiff breached said agreement and failed to devote the income to the payment of the debt; and that the plaintiff appropriated the income to his own use.

The court found that in November, 1941, the plaintiff and defendant contracted and agreed as follows: (here follows the language of the complaint which is above quoted). It was further found that the plaintiff had fully performed or was willing to perform; that the defendant had repudiated her obligation by selling the property and thus "breached by anticipation her promise and obligation to will to the plaintiff said real property"; that the property was worth $6,000 when it was sold; and that the plaintiff was indebted to the defendant for money had and received in the sum of $1,291.28. Judgment for the balance of $4,708.72 was entered in favor of the plaintiff, and the defendant has appealed.

The first and main question presented is whether the evidence is sufficient to support the finding to the effect that a valid contract existed, by the terms of which the aunt obligated herself to will this land to the nephew in return for his services in managing the property. There is no evidence of any oral contract, which would be unenforceable in itself. (Civ. Code, § 1624; Code Civ. Proc., § 1973.) ▉ It was incumbent upon the plaintiff to prove that the minds of the parties had met, and that they had entered into a definite contract. (*Long* v. *Rumsey,* 12 Cal.2d 334 [84 P.2d 146].) ▉ A contract to make a will must be clearly proved and unambiguous in all its terms. (Page on Wills, Lifetime ed., vol. 4, pp. 842-843.) If such a contract here existed, its existence and terms must be found exclusively in the letters relied on by the plaintiff.

The plaintiff testified that he had a business relation with the defendant; that it was "managing 80 acres of land"; that this relation began "in the fall of 1941"; and that the defendant was not there at that time. When asked if he had any agreement with her, oral or written, in regard to this business relationship, he replied: "Yes." When asked whether this agreement was oral or written, he replied: "It was written by letter." He then stated he had letters from the defendant relating to this business relationship, and these letters were introduced in evidence. He also testified that he did not recall receiving any letters "relating to the nature of your agreement as manager of this land" other than those introduced in evidence; that he kept a record and sent her the record book at the end of each year; that the balance shown in the bank account never did correspond with the balance shown in the statements which he had sent her because "I spent cash from the checking account for my own personal use"; and that, so far as he knew, the defendant did not know that he had used such funds for his personal use until he turned the check stubs over to her at her request in April, 1949.

The only material portions of the letters from the defendant to the plaintiff, as stipulated by the parties, are as follows: On August 27, 1942, she wrote: "I made a will last week Kermit and I willed Westland to you." On April 21, 1944, she wrote:

"Kermit I am so proud of you Honey. I know you were everything that Lee always thought you were— and you have proven yourself again and again. Lee looked up to you as

his most precious example and you have always been tops with me.—Westland will be all yours Kermit when I pass on—after the debt is paid off on it, I expect it to yield me a few dollars as well as giving you a living. You have won a hard fight and as I said it will be all yours when I go on.''

On January 31, 1945, she wrote:

''Dear Kermit, Mae and Woods: Kermit don't worry over Westland—sometime you will be glad you held onto it, I still believe in the soil . . .

''If you get discouraged and get a buyer—sell it and take half. I'm only holding it for you.''

On March 15, 1945, she wrote:

''Kermit when I come to Illinois I won't draw on Westland —because I want us to get that precious soil all paid off and then put the cash away to build a modern home out there for Mae, Kermit, Nora and Bob—you will need so many things besides a house, will be a garage, a barn, a shed for stock, a well and cistern—oh my dreams run on.''

On January 23, 1946, she wrote:

''Kermit again and again, I thank God for you my dear. Without you I know my interests in Illinois would have gone begging. As I told you before I have willed the Westland to you. After it is paid for or paid off I'd hope there will be a little income from it for both of us but whether or not it will be yours when I am gone—of course I intend living to a rotten old age but nevertheless it will be yours—I'd like you to divide it with George, but I don't need to tell you that you would anyway. However that will be up to you, as you see fit. Kermit is it possible for me here in California to give you power of attorney there in Illinois? I will if I can.''

And on April 19, 1947, she wrote:

''My boy—please forgive me for being (yellow) for a few hours. I just got panicky for a time—Westland is yours and always will be. As I told you when it is clear I hope to have a little income from off of it. You see I told you, that you and you alone can take Lee's place and calm me down— please forgive me if you can and know that (more than you will ever know) I appreciate what you have done for me I know that not one of them would have taken over as you have. Westland is yours when Aunt Georgia is no more. Just let me get a little income off of it when it is clear. You know me so well Kermit. I've had to be brave and keep my chin up for so long that while I actually had all of me down in the depths. Guess I'm just getting old and hellish. Again

I tell you Westland is yours. Keep this letter and if I ever go haywire again, send me a copy of it.''

The defendant testified that she came into possession of this land in November, 1941; that she first wrote to the plaintiff about this land in November, 1941, in reply to a letter from him ''telling me that he would take over for me if I desired''; that she arranged with the plaintiff to manage the land for her, but no formal agreement was made pertaining to this arrangement; that he later wrote her that he had taken over the management and had arranged for the land to be farmed; that in the beginning he was going to farm it himself; that he later wrote her that he and George were working the land together, and that one-half of the proceeds were paid over to George; that he did not tell her what the arrangement between himself and George was; that this was a customary rent in Illinois; that the plaintiff continued to do this until she went back in April, 1949; that she received reports as to the receipts and expenses each year; that the only agreement she had with the defendant was what is contained in the letters, and that she kept telling him in these letters to pay the mortgage off as soon as he had the money; that at one time she would have been willing for him to sell the place and take half of the proceeds; that she went back in April, 1949, and saw the plaintiff whom she had not seen since November, 1939; that she told the plaintiff that since $1,300 was available she wanted to go the next morning and pay off the mortgage on the land, which then amounted to about $1,150; that the next morning she asked the plaintiff for the money, and he replied ''I do not have it''; that when she asked where the money was, he replied: ''Well, it is available but I can't get it''; that he did not tell her where it was; that she demanded and received the check stubs and checks and took the handling of the money out of his hands; and that she then instructed his brother George what she wanted him to do.

The evidence shows, without conflict, that the ''business relationship'' whereby the plaintiff was ''managing'' this 80 acres began in the fall of 1941. There is no evidence that any contract of this nature was made then, or that any statements were then made by either party concerning any will provision. The only evidence concerning what was done at that time is that the plaintiff was to farm the land, or hire it farmed, and was expected to turn over half of the proceeds

to defendant. He did take charge of the land, and his account book shows entries of expense and income beginning with January 5, 1942, in which he accounted to her for one-half of the proceeds. Sometime in the second year, he wrote her that he and his brother George were working the land together, and that one-half of the proceeds were being paid to George. He and George owned and operated a place across the road and the only reasonable inference is that he shared in the tenant's part of the income. This arrangement, whatever it was, continued until April, 1949, when the defendant terminated it and apparently continued a lease arrangement with George for that season. There is no evidence of any change in the original arrangement, or of any different arrangement or contract at any time, unless it can be said to sufficiently appear from the letters written to the plaintiff by the defendant.

The first of these letters was written in August, 1942, some 10 months after the arrangement began. It merely said that she had made a will willing this land to him. Nearly two years later, in April, 1944, she wrote him that "Westland will be all yours Kermit when I pass on." Some 10 months later, in January, 1945, she wrote him that sometime he would be glad he held onto the land and if he got discouraged he might sell it and take half, that she was only holding it for him. The land had not produced much return up to then, and this statement merely indicates that she was willing at that time to give him half of the proceeds if he wanted to sell it. A year later, in January, 1946, she wrote that she had willed Westland to him, that "It will be yours when I am gone," and that she wanted him to divide it with his brother George. This letter in no way suggests such an agreement as that here claimed. In the final letter, written in April, 1947, she said that he was taking the place of her dead son, referred to her depressed spirits, and assured him that "Westland is yours when Aunt Georgia is no more."

In these letters the defendant twice said that she had willed this land to the plaintiff and several times expressed an intention to leave it to him after her death. Nothing is said in any of them to indicate anything in the nature of an agreement or that she had agreed to will the property to him because of anything he had agreed to do. These letters are not sufficient to show any agreement to the effect relied on by the plaintiff, nor any of the terms of any such agreement. They amount to no more than a promise, at best, and disclose

no such an agreement on the defendant's part, or a consideration therefor. The plaintiff did not testify that any letters were written by him which would affect the situation which existed during the years. As was said in *Monsen* v. *Monsen*, 174 Cal. 97 [162 P. 90] : ''Beyond all this, the evidence relied on, even if it could be regarded as tending to show with sufficient precision the making of any contract, utterly fails to support the precise contract alleged and found.'' The evidence produced is not sufficient to support the finding that an enforceable contract ·to convey this property by will was entered into by these parties.

The plaintiff argues that a consideration sufficiently appears, irrespective of the evidence, because the answer admitted that the consideration was the plaintiff's promise to manage the farm and keep accounts. The complaint described one agreement while the answer described a different agreement. At best, there was no admission of the contract and consideration which was alleged in the complaint. The trial was mainly devoted to the issue as to whether such a contract ever existed. The burden was on the plaintiff to prove the contract relied on, including the matter of consideration.

It is unnecessary to consider all the other points raised. It appears probable, however, that the amount of the damages allowed was excessive in any event. The court allowed the full value of the property. It is stated in the brief, and not denied, that the defendant was 55 years old at the time of the trial. Under plaintiff's claim he would not be entitled to the property until her death, had the agreement been made and performed. It would seem logical that a proper discount for cash in advance should be made in such a case. (See *Caminetti* v. *Pacific Mut. Life Ins. Co.*, 23 Cal.2d 94 [142 P.2d 741] ; *Aetna Life Ins. Co.* v. *Geher*, 50 F.2d 657.)

The judgment is reversed.

Griffin, J., and Mussell, J., concurred.