Tsetsy PANGAROVA, Appellant
(Plaintiff below),

v.

Nicke N. NICHOLS, Executrix of the Estate
of Nick A. Nichols, Deceased, Ap-
pellee (Defendant below).

No. 3465.

Supreme Court of Wyoming.

Nov. 2, 1966.

Ernest Wilkerson and Hawley M. Kilpatrick, Casper, for appellant.

Harry E. Leimback and Robert Jerry Hand, Casper, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Justice GRAY delivered the opinion of the court.

Plaintiff commenced an action against the defendant as executrix of the estate of Nick A. Nichols, deceased, to recover damages for a breach of contract purportedly made by deceased in his lifetime to adopt plaintiff and make her his heir. The case was tried with a jury present, and at the conclusion of the plaintiff's evidence the trial court sustained the motion of the defendant for a directed verdict and entered judgment accordingly. From the judgment plaintiff appeals.

██ The action taken by the trial court is to be viewed under the prevailing rule that the evidence offered by plaintiff will be taken as true with all the reasonable inferences and intendments to be drawn therefrom. Hawkey v. Williams, 72 Wyo. 20, 261 P.2d 48, 55; 73 Wyo. 463, 281 P.2d 447.

By way of general information concerning the controversy, the record discloses that the decedent came to this country from Bulgaria in the year 1913. He left behind a brother, Marin, who was married. Plaintiff is the youngest child of the brother and his wife. The decedent settled in Casper, Wyoming, became a naturalized citizen, and in the year 1929 married his first wife, Marie. The couple had no children. Over the years decedent prospered and at the time of his death left an estate valued at approximately $162,000. Sometime prior to the year 1947 the decedent and his wife Marie became interested in bringing plaintiff to America, and commencing in about the year 1947 there was mutual correspondence between the decedent, the plaintiff, and decedent's brother Marin toward that end. Understandably, Bulgaria being a Communist country, difficulty was encountered in arranging for plaintiff to come to the United States, and there was a delay of several years. In the meantime decedent's first wife, Marie, died in February 1955. In June 1956 decedent, who was then 69 years of age, married the defendant, who was then 35 years of age. Eventually the obstacles preventing plaintiff from coming to the United States were overcome and she arrived here in January 1957. She was met by the decedent and the defendant at the airport in Casper and taken to their home. She remained there for a period of approximately one month when, because of conditions existing in the home upon which we shall elaborate further, she left the home and took up residence in an apartment secured for her by the decedent. She remained there for approximately one and a half years, at the end of which time she moved her residence to Denver, Colorado, and did not again see the decedent. The decedent died testate in the year 1962, and by will all of his property was left to the defendant. The within action was commenced on March 20, 1963.

The claim of plaintiff is that decedent, as disclosed by the correspondence mentioned and other circumstances, made an offer that if plaintiff would come to the United States he would adopt her and make her his heir; that plaintiff accepted such

offer and performed or stood ready to perform all of the conditions imposed upon her by the resulting contract; and that the contract was breached by the decedent in disposing of his property contrary to such agreement, all to the damage of the plaintiff.

The answer of the defendant to the complaint was in substance a general denial, and no affirmative defenses were alleged. However, at one of the three pretrial conferences held in the matter defendant stated her contention to be that there was no contract entered into between the deceased and plaintiff; but should it be determined that such a contract was entered into, it was that plaintiff was to come here and take care of decedent for the rest of his life, and inasmuch as that was not done plaintiff failed in her performance under the contract and could not recover.

The trial court in stating its reasons for directing the verdict took the view that the letters upon which plaintiff relied did not fix the terms of the agreement with sufficient definiteness; that proof of a contract "of this nature must be direct and definite"; that there was no proof of such a change in position or action on the part of plaintiff "that to deny relief would amount to fraud"; that there was no performance; that she left the home of decedent to avoid disharmony in the home; that her coming here "on her uncle's money [was] not consideration that she put up." Upon a careful review of the record, we are convinced that the trial court was under some misapprehension as to just what the burden of plaintiff was in making out a prima facie case.

██ For example, we briefly refer to the last two reasons assigned. The ruling that plaintiff had left decedent's home to avoid disharmony is in substance a holding that plaintiff abandoned the contract. That was affirmative defensive matter in avoidance of the contract. Such matter was not pleaded by the defendant as required by Rule 8(c), W.R.C.P., and consequently was not an issue in the case.

The same thing is true of the failure of consideration. Furthermore, the removal of an alien from the land of his birth and from his parents and relatives to the United States has, under circumstances quite similar to the case here, been held to be a sufficient consideration. 1 Page on Wills, § 10.6, p. 457 (1960), and the cases there cited.

Largely determinative of the disposition to be made of the other grounds assigned are questions that relate to some sixty letters written by the deceased to the plaintiff, to his brother Marin, or to both, upon which plaintiff relied as disclosing the intention of decedent and as evidence of the offer made by decedent. Therefore, it will be helpful first to dispose of the matter of the letters. The letters were in the Bulgarian language. The parties stipulated that the letters were written by the deceased and that the translation into English appended to the letters was substantially correct. Nevertheless, at the time these letters were offered the defendant objected that no proper foundation had been laid for the reason that there was no evidence that the letters were "received by plaintiff, nor * * * ever mailed, nor that she ever relied upon the same, if the same constituted a contract." Defendant also objected that the letters were hearsay, incompetent, irrelevant, immaterial, and in contravention of the Deadman's Statute. The objections seem to have been sustained in part and overruled in part by the trial court's ruling that the letters would be admitted for the limited purpose of "showing intention and only as a statement against interest, being in his [decedent's] handwriting." We are not persuaded that the court was warranted in so limiting the proferred written evidence. In all fairness we can understand the trial judge's concern in, as he put it, firing "a mass of papers of this kind [at the jury] and say * * * 'you write this contract.'" A large number of the letters had little, if any, probative value. Yet, a review of the letters will

disclose, without too much difficulty, language tending to establish that an offer as claimed by plaintiff had been made in terms sufficient as a matter of law to form a contract, if accepted by the plaintiff. We shall comment on this further. A number of the letters were also material on whether or not the claimed offer, before acceptance, had been modified or withdrawn. Some of the letters, as the trial court recognized, were material for other purposes. Consequently, with respect to the letters, we agree with plaintiff that the court erred in attempting to limit the purpose of the offer; provided, of course, that a proper foundation had been laid.

■ As we understand the court's ruling, it did overrule the objection as to foundation and we think properly so. Plaintiff's lips as to receipt of the letters were sealed by the death of the writer. That, however, would not prevent proof of the mailing and receipt thereof by other evidence. What was the proof? In addition to the stipulation that the letters were in the handwriting of the decedent and that the translations were substantially correct, the record discloses that the letters were in the possession of the plaintiff; that there was mutual correspondence extending over a period of several years; a substantial number contain acknowledgments by each of the receipt of letters written by the other; and each letter bears a date upon which it was written. Under the authorities there can be little question that a proper foundation was laid. Metropolitan Life Ins. Co. v. Armstrong, 8 Cir., 85 F.2d 187, 194; Gosney v. Costigan, 326 Mo. 1215, 33 S.W.2d 947, 952; Scott's Ex'r v. Beland, 114 Vt. 383, 45 A.2d 641, 646.

■ Defendant's contention that the letters were not admissible because there was no proof that plaintiff had relied or acted upon the letters is wholly without merit. First, the objection states no proper ground for excluding the letters as evidence of the contract. Hendrix v. Pique, 237 Ala. 49, 185 So. 390, 394. Secondly,

it overlooks direct and circumstantial evidence to the contrary.

We now turn to what these letters and other evidence tend to prove.

In a letter to plaintiff dated December 19, 1946, decedent said he was inquiring about procedure for obtaining a passport for her to come to America "and stay for always here if you are agreed, and your parents are agreed." Then in a letter to plaintiff and her mother and father dated May 28, 1947, decedent said, "I think right after Tsetsy [plaintiff] comes here to us we will adopt her or transfer the property on her. I'll try as much as I can of helping her in every side, may come a day she will help me. * * * We are ready always with the biggest pleasure (to have her) if you are also." Several more letters intervened between that letter and a letter written on October 26, 1954, to the father and mother of plaintiff; and except as those letters reflect a determination and continuing desire on the part of decedent and his then wife Marie to bring plaintiff to the United States, not much of importance appears.

■ The letter of October 26, 1954, is, however, of significance. In this letter decedent, after informing of the terminal illness of Marie, stated:

"* * * I possess more than $100,000.00 property without any debts. I have a big amount of money in the bank, because I bought this year 3 houses, one house with 3 rooms, one house with 4 rooms, one house with 7 rooms all of them paid in cash, also a car $5,000.00 T.V. set $700.00 all are paid cash. Your sister in law doesn't love her daughter and grandchildren and that's why all properties are in my name. We have a mutual will between us, if she dies all remains to me, if I die all remains to Marie. If Tsetsy come we will adopt her and all will remain to her, she will be our heir, otherwise I don't know who else is going to inherit my properties and if I get ill I would know I'll have close relative to take care of me, not to expect

of strangers, they will take advantage of my property, instead you to have it."

It was contended by defendant that the offer, if it was an offer, was made to plaintiff's parents and not to her and was never communicated. We find no merit in that. Other evidence discloses that plaintiff had then reached her majority. Under § 1-726, W.S.1957, authorizing the adoption of an adult person, it is the adoptee that is required to consent to the adoption and not the parents. That was known or should have been known by decedent. Under the circumstances the question of whether or not the promise was made not only to plaintiff's parents but, also, through them as intermediaries, to the plaintiff was a question of fact. Kirch v. Nicholson, 42 Wyo. 489, 297 P. 398, 399. Moreover, where as here the consideration moves in whole or in part from the child, the parents may be regarded as agents for the child. Green v. Green, 298 Mass. 19, 9 N.E.2d 413, 415. See also 17 Am.Jur.2d, Contracts, § 310, p. 738. That it was communicated could be inferred from the action taken by plaintiff subsequent thereto.

Another letter of importance is that written to plaintiff and dated February 29, 1956. In this letter decedent explains the difficulty he is having in getting a visa for her and for her to have patience. The letter then goes on to say:

"* * * TOMORROW I WILL GO TO MAKE A NEW WILL, I WILL MAKE IT ALL TO BE LEFT TO YOU (AS MY BENEFICIARY).[1] IF SOMETHING BAD SHOULD HAPPEN TO YOU, PEKA WILL FOLLOW AFTER YOU, AND AFTER HER WILL BE HER CHILDREN, THIS WILL I DO NOT LIKE."

In this connection there is testimony by Mr. William Swanton, an attorney, that at one time a will was in effect naming plaintiff as *the* heir of decedent.

In other letters, written subsequent to the death of his wife Marie, the decedent told about women who were after him for his property, but assures plaintiff that when she comes to Casper she will find him "all alone." He also requested that plaintiff not marry, assuring her that when she got there she would find a suitable husband. Then on June 5, 1956, the decedent wrote plaintiff, advising her that he was going to marry the defendant. On July 10, 1956, he apologized for not having written for some time and explained that the reason for his delay was his marriage to defendant. He also acknowledged a telegram in which plaintiff had congratulated him and wished him a happy life with defendant. Then deceased goes on to describe defendant, her new aunt, as being "very good, and she will like you, love you, very much, and she wishes you a sooner arrival here. I believe you will like her. Maybe she will be your mother even though she is young, 35 years of age. * * * do not think now that because I am married I will not love and respect you. You will be for me the closest one to me. And your Aunt Nike will also love you as I do. Before I marry her I talked to her about you, and she is completely agreed that she would love you and respect you more than anyone else. * * * Nike, your new Aunt is agreed with all her heart that we adopt you, and you will be our daughter."

Other letters and the deposition of plaintiff's father disclose that plaintiff, with financial assistance from her father, departed from the family home in Sofia, Bulgaria, for Paris, France, late in the year 1955, from which point she was to embark for the United States. She arrived at Casper in the latter part of January 1957 and moved into the home of decedent and his then wife, the defendant.

We mentioned above that plaintiff left the home about a month later. Within a short time thereafter decedent executed a new will whereby all former wills were revoked. By this will all of the property of decedent was devised and bequeathed to

1. The parentheses are not ours but are a part of the translation.

defendant with the proviso that if she predeceased him it would go to their children and if there were no children all of decedent's property was to go to collateral relatives of the defendant.

In addition to the letters there was testimony of statements made by decedent to persons of long acquaintance. For example, Joye Kading testified that in about the year 1953 she and her husband visited the home of decedent. She testified that in their presence and in the presence of his then wife Marie, decedent said that "he and his wife felt since they had no heirs to leave their estate to, that the two of them had agreed that if his niece, Tsetsy Pangarova, would come to the United States, they would adopt her and make her their heir." Ruby Drazick and her mother, Anna Tomlin, testified to similar statements made by decedent. While we have said that such testimony is "weak evidence and must be carefully scrutinized," it is to be considered along with other evidence in the case. Slover v. Harris, 77 Wyo. 295, 314 P.2d 953, 962. The weight of it was for the jury.

Other evidence reflecting upon deceased's testamentary intention can be found in the record, but we think the foregoing is sufficient for our purposes. Perhaps we should add that plaintiff by an offered amendment of the complaint—which seems to have been overlooked—concedes that if she is entitled to relief, it is to be measured by the value of the estate after deduction for payment of claims, costs of administration and such, and the statutory allowances made to decedent's widow, the defendant. Such is in keeping with the general rule. In re Gary's Estate, 69 Ariz. 228, 211 P.2d 815, 820; ·Ward v. Ward, 94 Colo. 275, 30 P.2d 853, 855; Tod v. Fuller, Fla., 78 So.2d 713, 714; Patecky v. Friend, 220 Or. 612, 350 P.2d 170, 176–177; In re Soles' Will, 215 Wis. 129, 253 N.W. 801, 803.

We turn first to the quality of the evidence that plaintiff was required to produce. The trial court ruled that the contract had to be shown by direct evidence. While there is some authority to that effect, we have not gone that far even in cases where a claimant sought specific performance of an oral contract to make a will in consideration of personal services, which, of course, presents circumstances differing from this case. In a case of the former class we did say in Slover v. Harris, supra, that although such an agreement was enforceable the party seeking to establish it had a heavy burden. The evidence offered must be accepted with caution and carefully scrutinized. That was in keeping with the rule previously announced in Casper National Bank v. Curry, 51 Wyo. 284, 65 P.2d 1116, 1121, 110 A.L.R. 360, "that claims against the estates of deceased persons should be scrutinized with care and not permitted to prevail except upon clear proof." We also said in Canada v. Ihmsen, 33 Wyo. 439, 240 P. 927, 938,. 43 A.L.R. 1010, that a person may "contract to leave his property by will in the same manner that he may make a contract to sell it" and though "not favored" such contracts will be enforced if "clearly shown." The purpose of the rules so pronounced was, of course, to guard against fraudulent claims easily advanced by false testimony. Conversely, however, it was recognized that there are claims which, even though difficult of proof, warrant the aid of equity to enforce and no expression will be discerned in the foregoing that would make claimant's burden impossible in most cases, such as the rule imposed by the trial court. It must be remembered that a claimant's lips are sealed by the death of the promisor. The authorities recognize that whether the evidence is direct or circumstantial is not decisive. Walter v. Warner, 10 Cir., 298 F.2d 481,. 482, 483; In re Niehaus' Estate, 341 Ill. App. 454, 94 N.E.2d 525, 527; In re Dull's Estate, 184 Kan. 233, 336 P.2d 435, 439; Roberts v. Sutton, 317 Mich. 458, 27 N.W. 2d 54, 55; In re Williams' Estate, 10 Utah 2d 83, 348 P.2d 683, 685. The most that can be said of our previous admonitions.

is that we meant no more than to announce the reasonable rule—and the rule most often applied—which is that the evidence offered in proof of an oral contract to make a will must be clear and convincing. 1 Page on Wills, § 10.43, p. 527, et sequitur (1960). The rule requires something more than a mere preponderance, but does not connote proof beyond all reasonable doubt. In re Dull's Estate, supra; Bland v. Mentor, 63 Wash.2d 150, 385 P.2d 727, 728. Whether such evidence bears that quality is primarily for the trier of the facts. McMahon v. Auger, 83 Idaho 27, 357 P.2d 374, 378; Dilger v. McQuade's Estate, 158 Wis. 328, 148 N.W. 1085, 1087.

▮▮▮▮ Where as here, however, an offer has been made admittedly in the handwriting of the decedent the problem is rather simplified. It is only the oral testimony of decedent's intentions and admissions having a bearing upon the terms of the offer and the circumstantial evidence of plaintiff's acceptance of the offer that are required to meet the test.

The next question is whether the evidence adduced by plaintiff tended to establish, with a required degree of certainty, the terms and conditions of the claimed agreement. In this connection defendants have cited to us several cases pertaining to the showing that must be made to become entitled to the remedy of specific performance for enforcement of oral agreements. Here, of course, we are confronted with a promise in writing rather than an oral agreement. Another difficulty with those authorities is that plaintiff is not seeking specific performance. The action here is for damages for breach of contract. In Slover v. Harris, supra, 314 P.2d at 961, we noted that the requirements which defendants advance for evidence to establish that the minds of the parties met on definite terms were not so exacting in actions at law. See also 1 Page on Wills, § 10.5, p. 450 (1960).

▮▮▮▮ In either case, however, most courts consider and apply applicable general principles of the law of contracts. Nevertheless, with respect to contracts of the type under discussion, the courts are aware that such contracts are usually entered into by laymen without the aid of an attorney. It is recognized that their expressions, intentions, and understanding will vary in keeping with their intelligence and experience. For such reason a more liberal view is taken and it is not required that the terms be expressed with the clarity and preciseness of contracts in the market place. The important thing is that their purpose has been made clear. McMahon v. Auger, supra; 94 C.J.S. Wills § 112, pp. 865, 866.

In this connection we would point out that the contract claimed here was not one for personal services—the problem confronting us in Slover v. Harris and Casper National Bank v. Curry, supra. Neither is it a contract dealing solely with the matter of adoption. It is a contract containing a provision for adoption, coupled with a provision that the foster parent shall make the adoptee an heir. Such contracts are not uncommon in the case of minor children and are "generally construed to impose upon the adoptive parent an obligation to make the child an heir, which equity will specifically enforce." Annotation 171 A.L.R. 1318. Our difficulty here is that an adult is involved. Nevertheless, in pursuing the question of whether or not the terms of the agreement are sufficiently shown by plaintiff's evidence, it may be helpful first to refer to the language used in some of the more recent cases in this general area.

In In re Gary's Estate, 69 Ariz. 228, 211 P.2d 815, 818, the decedent orally promised the grandparents of claimant that he would "feed and clothe and educate me [claimant] and make me his heir and that I should inherit a child's part at his death." Her testimony was corroborated by an uncle who was present at the time of the alleged conversation, his version being that decedent said of claimant that he wanted to "make her my lawful child so that she can inherit

what is coming to her at my death." The contest was between claimant and a subsequent wife. As in the instant case the defense contended that when such a contract is indefinite and uncertain a court of equity will not decree specific performance. Of this the court said:

"We are agreed with that statement, but cannot agree that it is applicable here. In this case the contract was established by uncontradicted evidence of two persons, and corroborated by the signed aplication of the deceased for the adoption of appellant, stating that she would inherit his estate. Such evidence is neither indefinite nor uncertain."

In Frederick v. Christensen, 73 S.D. 130, 39 N.W.2d 529, 531, 532, claimant was legally adopted by the decedent but claimed that coupled with the agreement to adopt was an oral agreement that claimant would become the heir of the foster parents and receive their property upon their death. There was testimony of admissions made by the foster parents that they wanted "to adopt him [claimant] as their own child and give him everything when they were gone." Also, that claimant "would be the only heir they would have." There, as here, the lips of the claimant were closed by the death of the foster parents, but the supreme court under a rule more stringent than we have observed affirmed the judgment enforcing the contract. See also Crilly v. Morris, 70 S.D. 584, 19 N.W.2d 836, 837.

In Hicks v. Simmons, 10 Cir., 271 F.2d 875, 877, the oral promise made was that if the natural father and sister would give up custody of the claimants and make no objection to adoption, the foster parents "would give the plaintiffs a good home, educate them, and upon the death of the adoptive parents would leave their property to the plaintiffs [claimants]." The trial court's judgment that the contract was sufficiently definite and should be enforced was affirmed.

In Foster v. Cheek, 212 Ga. 821, 96 S.E.2d 545, 546, 550, the claimant had alleged that decedent had orally promised to adopt her, to provide for her welfare, and make claimant "his heir to inherit at his death as if she had been his natural child." The court held that the allegation was sufficient and if claimant proved that the promise was made, the court should decree that the claimant was entitled to recover the equivalent of what she would have received "had the adopter performed his contractual obligation to formally and legally adopt the child involved."

Another case, In re McLean's Estate, 219 Wis. 222, 262 N.W. 707, 708, although not dealing with the matter of adoption, is pertinent to the question of the sufficiency of plaintiff's evidence to establish the promise made. Here the oral promise was that decedent would make provision in his will "sufficient to obviate his [claimant's] becoming a public charge under the poor laws." Subsequent to the promise the decedent made a will whereby he devised a farm to a cousin as trustee to pay the net income thereof to claimant, his brother, during the brother's lifetime. However, decedent was married and as a result of his widow and an adopted daughter exercising their statutory allowance in lieu of taking under the will, the whole of the estate went to them. The trial court refused to admit the will to probate apparently on the ground that the claim of the brother was too indefinite as to terms. The supreme court reversed, holding that if the oral agreement was indefinite as to terms it was made definite by the will, and at 262 N.W. 710 stated as follows:

" * * * What the testator does by a will made pursuant to the promise is taken as what he intended to do in fulfillment of it. What was left uncertain in the instant case was made certain by the testator's performance of his promise. * * * "

See also In re Soles', Will, 215 Wis. 129, 253 N.W. 801.

Is plaintiff's evidence of the terms of the decedent's promise analogous to the foregoing? We think it is. The letter of October 26, 1954, after describing the prop-

erty which decedent owned,[2] goes on to say, "we will adopt her [plaintiff] and all will remain to her, she will be our heir." The terminal illness of Marie was then known to both the decedent and the plaintiff. After Marie's death in February 1955 decedent wrote to plaintiff saying he was making a new will, "ALL TO BE LEFT TO YOU AS MY BENEFICIARY." The letter was followed by the execution of a will carrying decedent's avowed intention and purpose into effect. In conjunction with that evidence there must also be considered the letter of July 10, 1956, wherein decedent, among other things, said that defendant had agreed "that we adopt you, and you will be our daughter." When such evidence and other corroborating evidence is viewed as a whole in the light of the authorities cited, we think the trial court and this court cannot say that plaintiff's evidence as to the terms of the offer was so indefinite, unclear, and unconvincing that plaintiff failed to make out a prima facie case. True, there was some ambiguity, but what the decedent meant by the language used in the letters was a question for the jury in the first instance.

■■■■ There can be little doubt, also, that plaintiff's evidence, if accepted by the jury, was sufficient to show the conditions imposed upon the plaintiff by decedent. Briefly, such evidence tended to establish that plaintiff was to leave her own family in Bulgaria and come to Casper; that she was to remain single until she arrived; that as an adopted daughter plaintiff owed decedent and his new wife affection, devotion, association, service, and obedience;[3] and that plaintiff was to consent to the adoption.

■■■■ A further question is whether or not there was evidence from which it could be inferred that plaintiff had accepted decedent's offer. No written evidence disclosing an acceptance was produced. Nevertheless, as we noted above, acceptance could be shown by circumstantial evidence. It may be implied from the acts, conduct, and performance by the offeree of the promise requested of him. 17 Am.Jur.2d, Contracts, § 45, p. 383. With respect to this it can scarcely be argued that plaintiff did not in good faith meet every obligation imposed upon her by the decedent up to the time she entered the Nichols' home. She had not married and the parties stipulated that she came originally from Bulgaria to Casper in the month of January 1957, where she was met at the airport by decedent and the defendant and taken to their home. It was also stipulated that she remained there "for approximately a month; that she left the home; that she took up residence in an apartment by herself; that said apartment was secured for her by the decedent; that he paid the first month's rent on the apartment; that thereafter she did not return as a resident to the home." In view of the stipulation, the critical question is, What happened in the home during the period plaintiff was there? The only evidence pertinent to that question is the testimony of plaintiff's witnesses Ruby Drazick and Anna Tomlin. Ruby Drazick, among other things, testified that on one occasion she was in the home and overheard an argument which lasted about one-half hour between decedent and defendant concerning plaintiff and the disharmony in the household. She also testified that at that time or later the decedent told her that he "couldn't live with both, the way the wife reacted to her"; that he couldn't live under that kind of strain, "so in order to get along in his household there would have to be

2. In Taylor v. Cathey, 211 Ala. 589, 100 So. 834, 836, the court set aside a directed verdict primarily for the reason that decedent in a letter had described the property involved in the promise.

3. The law implies these matters in the adoption of minors even though not ex-

pressed. Savannah Bank & Trust Co. v. Wolff, 191 Ga. 111, 11 S.E.2d 766, 771; In re Gary's Estate, supra. Just what might be expected of an adult adoptee in the way of association, service, and obedience can no doubt best be measured by the experience of jurors in raising children of their own.

some separation"; that "it would be best if Tsetsy left and he found other living quarters for her"; that "Tsetsy should leave his household"; that he had to do this "in order to keep peace with his wife." Anna Tomlin testified that when decedent and plaintiff were in her home the plaintiff started to cry and said, "her uncle wanted her to move, told her she had to move and he brought her here."

Recalling that on the state of the record we must accept such evidence as being true and recalling also that decedent had represented to plaintiff shortly before her embarkation from Europe that defendant would love her and had at least agreed that "we adopt you, and you will be our daughter," it is difficult to understand how the trial court could hold as a matter of law that plaintiff had failed to produce sufficient evidence tending to show substantial performance and legal excuse for her failure fully to perform. The actions and conduct of the defendant and decedent's failure to obtain her cooperation, as represented, was no excuse for decedent's failure to meet his obligations. Gibson v. J. T. Allen Agency, Wyo., 407 P.2d 708, 709; 17 Am. Jur.2d, Contracts, § 416, p. 868; 94 C.J.S. Wills § 116b(1), p. 875.

Moreover, even assuming that plaintiff may have consented to the arrangement made for her by decedent, the question can well be asked if she consented to anything more than a change in the mode of living that might well be expected of an adult daughter. Considering all of the circumstances, it is our view that the question of whether plaintiff by way of conduct and performance had accepted the offer of decedent was primarily a question of fact and the trial court erred in ruling to the contrary. In this connection perhaps we should also mention that the question of the timeliness of acceptance has not been raised or argued.

Finally, we do not want to be understood as approving of the trial court's ruling that plaintiff had the burden of showing that denial of relief would amount to fraud. The more reasonable rule is: whether or not it would be inequitable to enforce plaintiff's claim. On the basis of the record as it now stands we are convinced the trial court could not declare that the claim of plaintiff was inequitable. Should the jury find that the contract claimed was made and was breached by the decedent, his widow would not be deprived of her statutory right to receive one-half of decedent's estate as provided in § 2-47, W.S.1957, and the property and rights vested in her by the provisions of §§ 2-213 to 2-217, inclusive, W.S.1957.

The judgment is reversed and the cause remanded with instructions to grant a new trial.

McINTYRE, Justice (dissenting).

I cannot concur in the opinion of Justice Gray for these reasons:

1. Such opinion overlooks the fact that even if Nichols promised property to his niece, his subsequent marriage revoked the offer by implication.

2. Such opinion confuses the situation where a contract is completed at the time of remarriage and the situation where it is admitted no contract was completed at the time of remarriage.

3. In equity, a contract by a decedent to leave his property to another should not be enforced against an innocent third party (such as a wife).

4. One who seeks damages for breach of an alleged contract such as plaintiff claims in this case is required to establish such contract by evidence which is clear, positive, certain and beyond all legitimate controversy; and plaintiff has not furnished such evidence.

1. *Revocation Implied From Marriage*

The opinion of Justice Gray points out that the parties stipulated plaintiff came originally from Bulgaria to Casper in January, 1957, which was seven months after Nichols married the defendant, his second wife. Also, such opinion states correctly that no written evidence disclosing an ac-

ceptance of any offer by plaintiff was produced. Hence, if any offer on the part of Nichols was ever outstanding, it could not have ripened into a contract until plaintiff came to the United States and performed her part of the supposed contract.

In the meantime, however, and prior to plaintiff's departure for this country, Nichols wrote her June 5, 1956, advising that he was going to marry defendant. On July 10, 1956, he wrote again advising that he had married defendant and acknowledging receipt of a telegram from plaintiff which congratulated him on his marriage and wished him a happy life with defendant. These events are set out in the opinion of Justice Gray. They show clearly that prior to any action on the part of plaintiff, which could be construed as acceptance of an offer from Nichols, she had been notified of the change in Nichols' position and circumstances, i. e., his marriage.

For Nichols to intend to give all his property to his niece when he was single and had no other close relatives would be one thing. For him to intend to give all of it to her after he married defendant would be a different and unbelievable thing. In Annotation 69 A.L.R. 14, 68–69, it is said (with cases cited as authority for such statement) the fact that an alleged contract is inequitable as to third persons may influence the court in determining its existence, since in such case its execution would be contrary to common observation and experience and against reasonable probabilities.

Our question is, should Nichols' intent to revoke any former offer made to his niece be implied from his subsequent marriage? I think so.

In the law of contracts, the rule is that revocation of an offer may be made by a communication from the offeror received by the offeree, which states or "implies" that the offeror no longer intends to enter into the proposed contract, if the communication is received before offeree has exercised his power of creating a contract by

acceptance of the offer. Anderson v. Stewart, 149 Neb. 660, 32 N.W.2d 140, 3 A.L.R. 2d 250. This rule is also recognized in Restatement, Contracts, § 41, p. 49; in 1 Page, Contracts, § 133, p. 204; and in 1 Corbin, Contracts, § 40, p. 167.

The author in the section cited from Corbin says other facts besides a notice of revocation from the offeror may make it unreasonable for offeree to accept and rely; and the offeree should be held to the standard of a reasonable man. If plaintiff is held to that standard in the case at bar, it becomes apparent she cannot claim she thought an offer from Nichols to give her all his property was still open when she came to America.

For her to do so would be like one claiming the right to buy land offered to him, when prior to an acceptance or performance, the offeree obtains knowledge that offeror has contracted to sell the land to another. The cases generally hold in such a situation that knowledge obtained by offeree, prior to his performance or acceptance, terminates his power of acceptance. Antwine v. Reed, 145 Tex. 521, 199 S.W.2d 482, 485; Hoover Motor Exp. Co. v. Clements Paper Co., 193 Tenn. 6, 241 S.W.2d 851, 853–854. See also 1 Corbin, Contracts, § 39, pp. 164–165; and 17 C.J.S.Contracts § 50, p. 712.

From what I have said, it is obvious we must necessarily look to the July 10, 1956 letter, written by Nichols to his niece after his remarriage, and to none of the other letters, for evidence of the offer which plaintiff supposedly acted upon when she came to the United States. If this letter is thought of as offering to make plaintiff a daughter of Nichols and defendant, that would not mean property had to be given.

It is not at all an uncommon practice for a husband to leave all of his estate to his wife, regardless of children the couple may have. In the case before us, there was testimony indicating that before Nichols remarried he had made a will in favor of his niece.

But, like the will of any other testator, the will of Nichols was subject to change. It was revoked by a subsequent will. The right and competency of Nichols to revoke the will in favor of his niece and to make in lieu of it one in favor of his wife has apparently been litigated already and resolved in favor of the wife.

No promise was made in the July 10, 1956 letter to give all of the Nichols estate, or any property at all, to plaintiff. In fact, at no time after Nichols remarried did he ever promise to give plaintiff any property. And, for the reasons I have heretofore set forth, a contract cannot be predicated upon an offer supposedly made prior to such remarriage. Therefore, plaintiff's proof fails, and judgment for the defendant was proper.

### 2. *Completed vs. Uncompleted Contract*

The opinion of Justice Gray states, should the jury find that the contract claimed was made and breached by decedent, his widow would not be deprived of her statutory right to receive one-half of decedents estate as provided in § 2–47, W.S.1957, and the property and rights vested in her by the provisions of §§ 2–213 to 2–217, W.S.1957.

This statement would be applicable if (and only if) a contract had been completed between Nichols and plaintiff at the time of Nichols' remarriage, for the following reason:

> If a contract is made by an uncle to leave all of his property to a niece, prior to a subsequent marriage of the uncle, the courts under principles of equity and under statutory requirements both might apply the formula suggested by Justice Gray. On the other hand, if such a contract has not been completed or made when the uncle marries, then and in that event the courts are compelled to hold that the uncle cannot, under the law, complete a contract to leave all his property to the niece.

As I have heretofore pointed out, if any offer on the part of Nichols was ever outstanding, it could not have ripened into a contract until plaintiff came to the United States and performed her part of the supposed contract. Consequently, we are not dealing with the situation where an uncle has, prior to a subsequent marriage, made a completed contract to give all of his property to a niece. Instead, we are considering whether in this instance the uncle could and did complete such a contract in January, 1957, seven months after his remarriage. In other words, was there a meeting of minds at that time, and if so, will the law countenance it?

In order to say there was a meeting of minds in January, 1957, when plaintiff came to America, we would have to say Nichols, *at that time*, intended to give his niece one-half of his estate, less widow allowances provided for in §§ 2–213 to 2–217. The law would not permit more; and therefore more would be invalid. If Nichols ever had such an intention, he certainly did not express or imply it in any of his letters.

There is no reason or justification in trying to apply the equitable principle which Justice Gray seeks to apply, except in instances where a contract has already been completed and made at the time when promisor marries. There is obviously no evidence in this case, either direct or circumstantial, to show Nichols, at the critical time, intended to give his niece that portion of his estate suggested by Justice Gray. Hence, there could be no contract and plaintiff's proof was not sufficient to support her claim for damages.

The creditor's claim filed by plaintiff with the executrix as a prerequisite to suit; the complaint filed in this action; the settlement of issues in the pretrial conference report; and statements of plaintiff's counsel in oral argument to us, all make it very clear it is the contention of plaintiff that she is entitled to *all* of the Nick A. Nichols estate because he promised it to her "if she would come to the United States."

If such a promise was made, however, it was before Nichols remarried, and no promise pertaining to property was made after his remarriage. The letters relied upon by plaintiff contain no reference to a portion of Nichols' property. We cannot, of course, supply the omission and make them do so any more than we could recognize a contract for all of the Nichols estate.

*Completion Was Impossible.*

Why do I say completion of the alleged contract was impossible at the critical time, January 1957? Because §§ 2–47 and 2–213 to 2–217, W.S.1957, mean, after Nichols married defendant, he could no longer, under the law, leave all his estate to plaintiff. And plaintiff (charged with the standard of a reasonable man) was bound to know that Nichols could not then leave all his property to her. Thus, it must necessarily be concluded that his marriage impliedly revoked an offer, if there was one, to leave plaintiff all his estate; *and there was no offer or acceptance pertaining to a contract for part of it.*

In Restatement, Contracts, § 50, p. 57, it is stated without qualification that where, after the making of an offer and before acceptance, the proposed contract becomes illegal, the offer is terminated.

It is uniformly held that death of an offeror prior to acceptance or performance by the offeree renders completion of a contract impossible, because no contract can be consummated after the death or disability of either party. New Headley Tobacco Warehouse Co. v. Gentry's Ex'r, 307 Ky. 857, 212 S.W.2d 325, 327. See also 12 Am.Jur.2d, Contracts § 38; and 1 Williston Contracts, § 62, pp. 206–207 (3rd Ed).

In the case at bar, the marriage of Nichols *rendered completion of a contract to give all his property to plaintiff impossible,* because the laws of Wyoming (§§ 2–47 and 2–213 to 2–217) would not allow such a contract to be recognized or enforced.

It is important to notice that the letter of July 10, 1956, does not contain language indicating a desire to contract upon the condition that Tsetsy would come to the United States. In the letter, Nichols assured his niece that Nicke, his second wife, was very good and would like and love the niece and was "wishing her a soon arrival." This would contradict any idea plaintiff came on account of some supposed offer in the letter of July 10, 1956. She was already coming. Moreover, she was coming with full knowledge that supposed offers in previous letters were no longer operative.

All of my discussion having to do with whether Nichols, after marrying, could have completed a contract for all of his estate; and whether there was any evidence of an offer and acceptance pertaining to a contract for part of it, serves to point up the fact that the supposed contract has not been sufficiently established for us to know what portion of the Nichols estate is supposedly involved and what the terms of the contract are supposed to be. It is no wonder the trial court said the letters upon which plaintiff relies did not fix the terms of the agreement with sufficient definiteness.

In any event, there being no completed contract in existence at the time of the second marriage of Nichols; it having been unlawful for him to contract, after his marriage, for all of his estate; there having been no offer for plaintiff to act upon pertaining to a portion of such estate, at the time of her supposed performance; and the idea having been contradicted that plaintiff's consideration was the act of coming to the United States, there could be no contract for plaintiff to base a cause of action for damages upon.

The proposition that, in the absence of a previously completed contract, an uncle cannot, after he has married, complete a valid contract to give all of his estate to a niece has a connection with the next subject in my opinion. Additional reasons and the citation of authority for such proposition will therefore be set out in the

succeeding discussion pertaining to the rights of a wife.

### 3. *Rights of Wife*

One of the leading cases in establishing the principle that specific performance will not be decreed where it is claimed a decedent contracted to leave plaintiff his property, if the result would be harsh and oppressive or unjust to innocent third parties, is Owens v. McNally, 113 Cal. 444, 45 P. 710, 712–713, 33 L.R.A. 369. As near as I can tell, this case has been universally recognized as good authority and followed with very little exception. Before discussing some of the more recent authority for the same principle, I think it will be worthwhile to review some of the language used in the Owens opinion, because it is exceedingly apropos to our own case.

It was reasoned in the Owens case that relief under the alleged contract could not be granted without sweeping aside the rights of the wife and widow, vested under a contract most strongly favored by the law. The court said while the alleged contract was not void as against public policy at the time it was entered into, it must be held the parties to it contracted in view of the fact that a subsequent marriage by decedent might be consummated; and the effect of this marriage would be to compel a court of equity, in justice to the widow or children to deny relief. Or viewed in another way, the court said, it must have been within the contemplation of the parties that decedent might marry; for the contract could not have been designed as a restraint upon his marriage, or it would be void.

There was no equivocation on the part of the Supreme Court of California, in the Owens case, in announcing that if the contract embraced the taking of deceased's estate to the exclusion of any future wife or child, the court would have no hesitation in saying the contract was void as against public policy.

The rule adopted in the Owens case was recognized in Fowler v. Hansen, 48 Cal. App.2d 518, 120 P.2d 161, 164, the court saying a person may make a valid agreement binding himself to dispose of his property in a particular way, but such a contract must show adequate consideration, must be definite and certain, and the remedy asked for must not be harsh and oppressive or unjust to innocent third parties or against public policy.

Also, in Fowler v. Security-First Nat. Bank of Los Angeles, 146 Cal.App.2d 37, 303 P.2d 565, 572, the court specifically followed the Owens case and refused to enforce a contract which would prevent a testator from fully providing for his wife, a natural and legitimate object of his bounty. For additional recognition of the principle in the Owens v. McNally case see Annotation 69 A.L.R. 14, 67–73 and 161, n. 45; Annotation 11 A.L.R.2d 309, 442, n. 13.

In the annotation in 69 A.L.R. 14, at pp. 70–71, it is made clear that a contract such as the one alleged in the case before us cannot be enforced if the result is inequitable. As, for example, where after an agreement of this character was made the promisor married again and had issue. The reason given is that the result would be both inequitable and against public policy.

It surely follows that if a *completed agreement,* as dealt with in the text and in the Owens case and other cited cases, cannot be enforced, then where no agreement has been completed at the time of marriage but only an offer to contract is claimed, the offer should be treated as having been impliedly withdrawn by the marriage.

In the case before us, it must have been within the contemplation of plaintiff that Nichols might marry. Indeed, there was considerable reference to it in his letters. At one time he spoke of considering marriage with a woman from New York. At another time he spoke of wanting to marry a woman from South Dakota. In another letter he discussed suggestions which had been made by the niece to the

effect that he marry a certain Polish woman.

This evidence clearly establishes, in my view, that it was within the contemplation of the parties that Nichols would or might marry. Therefore, since plaintiff is claiming the existence of a contract which would have embraced the taking of the deceased's entire estate to the exclusion of any future wife or child, we should have no hesitation, on the authority of Owens v. McNally, in saying we cannot presume the parties intended to consummate such a contract because it would have been contrary to public policy and hence void.

Generally, of course, a contract against public policy or against the mandate of a statute may not be made the foundation of any action, either in law or in equity. Stockton Morris Plan Co. v. California Tractor and Equipment Corp., 112 Cal.App. 2d 684, 247 P.2d 90, 92; Martinez v. Johnson, 61 Nev. 125, 119 P.2d 880, 882.

If Nichols, because of his marriage, could not complete a valid contract to leave all of his property to his niece at the time she came to America, then it must be concluded that his marriage impliedly revoked any possible offer to do so, where plaintiff had not accepted or acted upon any offer at the time of the marriage.

### 4. *Was Proof Clear and Definite?*

I cannot conclude my dissent without saying the trial court, in my opinion, was quite right in ruling a contract such as the one alleged here (that Nichols would give all his estate to plaintiff for coming to the United States) has to be shown by direct and definite evidence. Justice Gray's opinion states, while there is "some" authority to that effect, we have not gone that far.

I think we have gone that far. For example, Justice Blume for this court, in Canada v. Ihmsen, 33 Wyo. 439, 240 P. 927, 928, 43 A.L.R. 1010, said such contracts are not favored, and the courts generally hold, upon good reason, that they must be clearly shown in order to be enforceable. Also, the Supreme Court of

Wyoming, in Slover v. Harris, 77 Wyo. 295, 314 P.2d 953, 962, where recovery was sought for breach of a contract to will property, said the trial court, having in mind, no doubt, the quality of proof necessary to prove such contracts, found against plaintiffs. It then sustained the finding.

To the same effect is Jennings v. D'Hooghe, 25 Wash.2d 702, 172 P.2d 189, 190, where the Supreme Court of Washington said such contracts are not favored and are even regarded with suspicion and will not be enforced except upon the strongest evidence of valuable consideration and deliberate agreement by deceased.

The rule was applied in a case much like the one at bar, in Wood v. Wrigley, 119 Cal.App.2d 90, 258 P.2d 1049, 1053, where a nephew brought an action for damages, claiming his aunt had agreed to convey realty to him. Evidence, including letters of the aunt to the nephew in which the aunt twice said she had willed the land to the nephew and several times expressed an intention to leave it to him after her death, was held insufficient to support a finding that such a contract existed.

The rule that one seeking damages, for breach of an alleged agreement to give property, must establish the contract by evidence which is clear, positive, convincing, satisfactory, certain and beyond all legitimate controversy is so consistently accepted and followed in this country that it must be accepted as a universal rule. Some of the more recent cases from states in the Pacific area, which have applied this rule, are the following:

Wood v. Wrigley, 119 Cal.App.2d 90, 258 P.2d 1049; Lynch v. Lichtenthaler, 85 Cal.App.2d 437, 193 P.2d 77; Hoff v. Armbruster, 125 Colo. 198, 242 P.2d 604; Wehrle v. Pickering, 106 Colo. 134, 102 P.2d 737; Thomas v. Thomas, 83 Idaho 86, 357 P.2d 935; Anderson v. Whipple, 71 Idaho 112, 227 P.2d 351; Johnson v. Flatness, 70 Idaho 37, 211 P.2d 769; In re Mueseler's Estate, 188 Kan. 407, 362 P.2d 653; In re Duncan's Estate, 186 Kan. 427, 350 P.2d 1112;

In re Wert's Estate, 165 Kan. 49, 193 P.2d 253, opinion adhered to 166 Kan. 159, 199 P.2d 793; Shook v. Woodard, 129 Mont. 519, 290 P.2d 750; Cox v. Williamson, 124 Mont. 512, 227 P.2d 614; Lindley v. Lindley, 67 N.M. 439, 356 P.2d 455; McDonald v. Polansky, 48 N.M. 518, 153 P.2d 670; Barchus v. Pioneer Trust Co., 229 Or. 268, 366 P.2d 890; Hunter v. Allen, 174 Or. 261, 147 P.2d 213, modified as to other matter 174 Or. 261, 148 P.2d 936; Silhavy v. Doane, 50 Wash.2d 110, 309 P.2d 1047; Ferris v. Blumhardt, 48 Wash.2d 395, 293 P.2d 935; Boettcher v. Busse, 45 Wash.2d 579, 277 P.2d 368, 49 A.L.R.2d 191; In re Hickman's Estate, 41 Wash.2d 519, 250 P.2d 524; Jansen v. Campbell, 37 Wash.2d 879, 227 P.2d 175; Jennings v. D'Hooghe, 25 Wash.2d 702, 172 P.2d 189; McGregor v. McGregor, 25 Wash.2d 511, 171 P.2d 694; Auger v. Shideler, 23 Wash.2d 505, 161 P.2d 200; Whiting v. Armstrong, 23 Wash.2d 290, 160 P.2d 1014; Payn v. Hoge, 21 Wash. 2d 32, 149 P.2d 939; Dau v. Pence, 16 Wash.2d 368, 133 P.2d 523; and Aho v. Ahola, 4 Wash.2d 598, 104 P.2d 487.

As I see it, the trial judge in the case at bar was correct in finding that the letters relied upon by plaintiff did not fix the terms of the agreement with sufficient definiteness, and that proof of a contract of this nature must be direct and definite. It is regrettable that he is being reversed on such a finding.

For the four reasons discussed herein the judgment of the district court ought to be affirmed and not reversed. The conclusion is inescapable, as I have pointed out, that Nichols did not at any time after his remarriage promise to give his niece any property at all. Consequently, there is no basis for the recovery of damages, even if plaintiff is given the status of an adult daughter. The law has not seen fit to prohibit a husband from willing all of his estate to his wife regardless of minor or adult sons and daughters, adopted or natural.